Nellenback v Madison County (2025 NY Slip Op 02263)

Nellenback v Madison County

2025 NY Slip Op 02263

Decided on April 17, 2025

Court of Appeals

Wilson, Ch. J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on April 17, 2025

No. 37 

[*1]Michael Nellenback, Appellant,
v
Madison County, Respondent.

Hillary M. Nappi, for appellant.
Kevin G. Martin, for respondent.

WILSON, Chief Judge

In the summer of 1993, the parents of 11-year-old Michael Nellenback had him designated as a person in need of supervision (PINS) and placed in the care of Madison County's Department of Social Services. The Madison County Department of Social Services assigned caseworker Karl Hoch to the Nellenback case. According to Mr. Nellenback, over the next three years, Mr. Hoch repeatedly sexually abused and assaulted him. It turned out that Mr. Hoch had sexually abused several other children to whose cases he was assigned.
In 2019, Mr. Nellenback filed suit against Madison County under the claim-revival provision of the Child Victims Act, alleging that that the County was negligent in hiring, supervising, and retaining Mr. Hoch. The sole issue on appeal is whether Mr. Nellenback raised a triable issue of fact on his negligent supervision claim. We hold that he did not: Even viewed in the light most favorable to Mr. Nellenback, the evidence was insufficient to prove the County was on notice of the abuse and that it negligently placed Mr. Hoch in a position to cause harm. We therefore affirm.
I.
Michael Nellenback had various behavioral issues as a child, including a suicide attempt at age 10, which prompted his father, in the PINS petition, to request that he be placed outside the home. In July 1993, the court ordered him placed into the custody of the Madison County Department of Social Services (DSS). He spent the next four years cycling between different residential placements, including two residential treatment facilities, multiple foster homes, and a facility for juvenile delinquents.
Shortly after Mr. Nellenback came into the County's custody, Karl Hoch was assigned to his case. As a caseworker, he was responsible for transporting children, including Mr. Nellenback, to and from periodic court appearances and between the various residential placements. At first, while Mr. Nellenback was still living with his parents, he saw Mr. Hoch every weekend or every other weekend. Once Mr. Nellenback was placed into his first group home, he saw him less frequently, but still regularly, as Mr. Hoch shuttled him to court proceedings and appointments and between placements.
According to Mr. Nellenback, Mr. Hoch began sexually abusing him after their second meeting. The abuse included fondling, touching, oral sex, and attempts at anal intercourse, and took place at every visit, either in Mr. Hoch's County-issued car or at roadside stops or motels. Mr. Hoch threatened Mr. Nellenback that if he told anyone, Mr. Nellenback would "get locked up." Mr. Nellenback was receiving regular counseling at the time, facilitated by and at his residential placements, but because of the threat, he did not tell his counselors, nor anyone else, about the abuse.
In early 1996, DSS received a report that Mr. Hoch had abused a different child in his care. DSS reported him to law enforcement, and, following an investigation, he was arrested. Mr. Hoch was later convicted of various sex crimes and sentenced to two and a half to seven years in prison. He died in prison in 2001.
In September 2019, Mr. Nellenback filed suit against Madison County, alleging that the County was negligent in hiring, supervising, and retaining Mr. Hoch as a caseworker. Mr. Nellenback's claim was revived by the Child Victims Act, which allowed plaintiffs who were sexually abused as minors to file claims during a two-year filing window beginning on August 14, 2019 (see CPLR § 214-g). In April 2022, the County moved for summary judgment, arguing that there was no proof that the County failed to properly hire, train, supervise or direct Mr. Hoch. In support of its motion, the County submitted deposition testimony from Mr. Nellenback; testimony from Ann Hogg, Karl Hoch's supervisor at DSS; and testimony and an affidavit from Michael Fitzgerald, the current DSS Commissioner for Madison County.
Ann Hogg began working for the County as a caseworker in 1968, and around 1990 was promoted to supervisor of the Foster Care Preventive Unit. As a supervisor, Ms. Hogg met with caseworkers regularly to talk about the cases and hear updates on the children. When asked if she reviewed case workers' case files regularly, she responded, "Not as regularly as I should have, but yes." Ms. Hogg explained that she met with caseworkers "very regularly" and "was very much aware of what [they] were doing."
Both Ms. Hogg and Mr. Fitzgerald testified that, prior to 1996, the County had no information to suggest Mr. Hoch had any propensity to commit sexual abuse. Mr. Fitzgerald, then a caseworker in the Child Protective Services Unit, which had its office next door, testified that the County had never received any complaints of misconduct regarding Mr. Hoch. According to Mr. Fitzgerald, before being hired as a caseworker, Mr. Hoch "had a good work record" with the County and, after his transfer to DSS, received an award as "Madison County Employee of the Year" in 1990.
Mr. Nellenback opposed the County's motion [FN1]. He argued that there was evidence of deficiencies in both oversight and training, which raised issues of fact regarding the County's liability for negligent supervision. Specifically, he pointed to Ms. Hogg's statement that she did not review caseworkers' notes "as regularly as [she] should have," as well as her statement that, while she was supervisor, the County had no handbook for how caseworkers should perform their duties and they "learned by the seat of our pants, really, as through experience." Mr. Nellenback also proffered expert testimony from Dr. Michael Nunno, a former senior caseworker with another county's department of social services. Dr. Nunno testified that the County's supervision structure was relatively "[l]ax." Dr. Nunno concluded that, though lax standards alone "may not be the immediate trigger for an adverse sexual event caused by a caseworker with pedophilic tendencies . . . [w]hen coupled with slack recruitment and hiring standards," they contributed to giving Mr. Hoch "unfettered access to" children.
Supreme Court granted the County's motion and dismissed the complaint. The court held that the County made a prima facie showing that it lacked actual or constructive knowledge of Mr. Hoch's propensities, and that, even viewed in the light most favorable to Mr. Nellenback, there was no proof that any further investigation or supervision would have led the County to uncover the abuse.
The Appellate Division affirmed with two Justices dissenting (223 AD3d 1025 [3d Dept 2024]). The majority reasoned that Ms. Hogg's sporadic view of notes and the absence of notes documenting Mr. Hoch's interaction with Mr. Nellenback did not create a triable issue as to whether DSS knew or should have known of the sexual abuse: as, without any evidence signaling a propensity for sexual offending, "the suggestion that a more formal review may have revealed some indication of improper interactions with plaintiff amounts to nothing more than hopeful speculation" (id. at 1029). The dissent disagreed and concluded that dismissal of the negligent supervision claim was error [FN2]. According to the dissent, Ms. Hogg's failure to review notes regularly "left [Hoch] in a position to cause foreseeable harm," and that had Ms. Hogg reviewed notes, "she would have learned that Hoch failed to document any interaction with plaintiff—an omission that presented a genuine concern as to Hoch's conduct and the safety of the child" (id. at 1030).
II
To prevail on a motion for summary judgment, the movant must make a prima facie showing by submitting evidence that demonstrates the absence of any material issues of fact (CPLR 3212[b]). Once that initial showing has been made, the burden shifts to the opposing party to show there are disputed facts requiring a trial (see Bazdaric v Almah Partners LLC, 41 NY3d 310, 316 [2024], citing Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). All facts are viewed in the light most favorable to the non-moving party (id.).
A plaintiff bringing a negligence action must allege "a duty owed to the plaintiff by the defendant, a breach of that duty, and injury proximately resulting therefrom" (Moore Charitable Found. v PJT Partners, Inc., 40 NY3d 150, 157 [2023] [Moore], citing Pasternack v Laboratory Corp. of Am. Holdings, 27 NY3d 817, 825 [2016]; Solomon v City of New York, 66 NY2d 1026, 1027 [1985]; Akins v Glens Falls City School Dist., 53 NY2d 325, 333 [1981]). "When an employer has notice of its employee's propensity to engage in tortious conduct, yet retains and fails to reasonably supervise such employee, the employer may become liable for injuries thereafter proximately caused by its negligent supervision and retention" (Moore, 40 NY3d at 157; cf. Restatement [Second] of Torts § 317 [1965]). Thus, to a state a claim, a plaintiff must allege, among other elements, that the employer knew or should have known of the employee's tendency to engage in the tortious conduct (the "notice" element) (see id. at 158).
Mr. Nellenback fails to raise a triable issue on notice. It is undisputed that the County had no actual knowledge that Mr. Hoch had previously committed or had any propensity to commit sexual abuse. Therefore, to hold the County liable, Mr. Nellenback relies on a theory of "constructive knowledge," contending that the County was aware of facts from which it should have known of Mr. Hoch's dangerous propensity (see id. at 158 ["An employer 'should know' of an employer's dangerous propensity if it has reason to know of the facts or events evidencing the propensity"]). Adopting the Appellate Division dissent's position, Mr. Nellenback argues that if Ms. Hogg had been more diligent in reviewing employees' case notes, she would have realized that Mr. Hoch was not taking any notes of his time with Mr. Nellenback and concluded that Mr. Hoch was engaged in some untoward behavior with Mr. Nellenback.
That argument fails for two reasons. First, it rests on a faulty assumption. Mr. Nellenback argues that the absence of any of Mr. Hoch's records documenting his interactions and trips with Mr. Nellenback was in itself suspicious. However, the evidence does not show that Mr. Hoch did not keep notes: the Commissioner of DSS testified that records are kept for 10 years past the child's 18th birthday, which in this case, would have been 2010, and then are routinely destroyed. Mr. Nellenback provided no evidence to suggest that Mr. Hoch did not keep records initially, and thus an essential element to Mr. Nellenback's claim of breach of duty is absent. To avoid summary judgment, the opposing party must provide evidence based on more than hypothetical or unsubstantiated assertions (see Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; see also Friends of Animals, Inc. v Associated Fur Mfrs., Inc., 46 NY2d 1065, 1068 [1979]). Mr. Nellenback's surmise that the absence of records a decade after they would have been automatically destroyed shows that they never existed in the first place, and his dependent inference that the County must have negligently overlooked the absence of notes, is "patently inadequate" to establish a triable issue regarding the inadequacy of the County's supervision (id. at 563).[FN3]
Second, Mr. Nellenback does not claim that any records kept by Mr. Hoch would have contained evidence of abuse. Rather, he contends that, had anyone noticed Mr. Hoch was not taking notes, that would have been a red flag that would have alerted the County of his potential abuse. That argument is also based on flawed assumptions and fails to consider the limited role of caseworkers in this context. During the period in question, Mr. Nellenback was living in various group homes and treatment facilities. Those facilities were the primary entities responsible for his care. The primary role of caseworkers was to transport children. Caseworkers were also expected to monitor [*2]children's progress; however, the extent of their expectation to document that progress is unclear: Ms. Hogg testified that caseworkers provided information on "a self-reporting kind of system." Additionally, though caseworkers were expected to record trips, that requirement existed for vehicle availability, inventory and usage purposes—not, as Mr. Nellenback asserts (without support), to monitor where individual children were being transported or to track the duration of each trip. It is simply too speculative to suggest that increased review of those kinds of records would have put the County on notice of the abuse [FN4].
Here, there was neither evidence that the County had any knowledge of Mr. Hoch's abuse before the report of his abuse of another child in 1996, nor any evidence the County was aware of any conduct that could have alerted them to the potential for harm. The dissent contends that there are triable issues of fact as to whether the County "created a culture of laxity" that facilitated Mr. Nellenback's abuse (dissenting op at 9). However, we have never held that a party can prove negligent supervision by stating the employer "should have known" an employee was likely to engage in dangerous conduct without evidence showing any prior conduct, warnings, or signs of risk to that effect (see Brandy B. v Eden Cent. Sch. Dist., 15 NY3d 297, 302 [2010]; see also Moore, 40 NY3d at 159])[FN5]. [*3]References to generalized norms or practices alone are not sufficient where, as here, there is nothing in the record that indicates the County had any opportunity or reason to know about the abuse.[FN6]
Even if evidence of lax practices were sufficient to prove notice, Mr. Nellenback fails to point to any evidence that shows the County deviated from the standard of care that was reasonable at the time. Mr. Nellenback relies on statements in Ms. Hogg's testimony that, when she started working for the County, her unit had no handbook or guidelines on how caseworkers should operate, and they received no specific training related to child sexual abuse. As both parties acknowledge, the field of child sexual abuse prevention has evolved significantly in the past three decades. The County's brief in our Court explains that both record keeping and training requirements have evolved significantly as the State has developed "better legislation and systems to guard against child sexual abuse." In 2021, two years after Mr. Nellenback filed this lawsuit, the legislature added Social Services Law § 413(5), which creates a mandatory training in child abuse identification and reporting and is set to be implemented by April 1, 2025. Though the guidelines for prevention and identification of child sexual abuse have evolved over time, on these facts, there is not a sufficient basis to support an inference the County departed from the governing standard of care [FN7]. In sum, because Mr. Nellenback has not adduced evidence to create a triable issue as to the County's constructive notice, any jury determination based on the record here would be purely speculative. Thus, his claim cannot withstand summary judgment (see Zuckerman, 49 NY2d 557 at 562).
[*4]III.
New York enacted the Child Victims Act to "open the doors of justice to thousands of survivors of child sexual abuse" (Senate Mem in Support, Bill Jacket L 2019, ch 11). The County does not dispute that its employee, Mr. Hoch, sexually abused Mr. Nellenback. Mr. Nellenback is disadvantaged, as are many CVA plaintiffs, by the passage of time. The absence of records poses a significant obstacle to plaintiffs' efforts to learn the causes that may have produced and enabled abuse. Although those evidentiary difficulties exist, the standard for summary judgment on a CVA claim, like any other claim, is whether there is sufficient proof to raise a triable issue of fact.[FN8] Mr. Nellenback failed to provide sufficient proof such that a jury could conclude that the County had actual or constructive notice of Mr. Hoch's propensities or that the County would have been on notice but for its allegedly lax supervision and training. Thus, the County met its burden on summary judgment, and the Appellate Division correctly dismissed Mr. Nellenback's complaint. Accordingly, the order of the Appellate Division should be affirmed, with costs.

RIVERA, J. (dissenting):

Plaintiff's allegations of repeated child sexual abuse are horrific and all the more shocking if, as he asserts, he was molested in a government car and at motels by his caseworker, whom defendant Madison County authorized to spend lengthy periods alone with him, away from any other adult. The caseworker was eventually convicted of multiple counts of sexual abuse of other children placed in his care by the County, but not for his alleged abuse of plaintiff. Plaintiff, now an adult, sues under the Child Victims Act ("CVA") to hold the County accountable, in part, for its alleged negligent supervision.
The County concedes that it never discovered the alleged abuse, but claims it had no basis for suspecting the caseworker. Plaintiff asserts that the County's alleged ignorance of the abuse was of its own doing and a predictable result of the County's lax supervision. Plaintiff's submissions confirm that the County relied on the caseworker's "self-reporting" with little to no oversight, which in turn facilitated isolation of plaintiff and concealment of the caseworker's abuse. As the caseworker's direct supervisor candidly admitted, she did not have time to read every case note, did not meet with caseworkers "as regularly as [she] should have" and caseworker reviews were "not really a big deal" or "taken very seriously." Plaintiff's expert also identified several assessment reports describing plaintiff's concerning behavior, which suggested that he was the victim of sexual abuse, and that would have put any [*5]responsible agency on notice that plaintiff was at risk. Thus, on the record before us, the County was not entitled to summary judgment on plaintiff's negligent supervision claim because there are triable issues of material fact as to whether it should have known about the dangers to plaintiff presented by its employee.
The majority applies what is essentially a heightened standard for constructive notice in negligent supervision cases involving sexually abused children that is contrary to law and a barrier to relief for plaintiffs. The outcome here undermines the CVA, which is intended to reopen the courts to people like plaintiff, whose childhood was destroyed by a sexual predator who was employed and empowered by those charged with their protection. I dissent.
I.
In 2019, plaintiff filed a complaint against defendant Madison County under the Child Victims Act. Enacted earlier that year, the CVA "provided that previously time-barred tort claims based on sex offenses against children could be brought within a specified time" (Jones v Cattaraugus-Little Val. Cent. School Dist., — NY3d &mdash, &mdash, 2025 NY Slip Op 01007, *1 [2025]; see CPLR 214-g). In reviving these claims, the Legislature sought to "finally allow justice for past and future survivors of child sexual abuse" and to "shift the significant and lasting costs of child sexual abuse to the responsible parties" (LG 2 Doe v Jasinski, 195 AD3d 1399, 1403 [4th Dept 2021], quoting NY Comm Report, 2019 NY Senate Bill S2440).
Plaintiff alleges that between the ages of 11 and 14, his County-assigned caseworker sexually abused him repeatedly. Among other claims, and as relevant to this appeal, plaintiff alleges that the County's negligent retention and supervision of the caseworker were the proximate cause of this sexual abuse.
According to the complaint, in 1993, eleven-year-old plaintiff was placed in the custody of the County's Department of Social Services ("DSS") as a person in need of supervision. For the next three years, the caseworker regularly sexually abused him. Plaintiff was initially moved from his mother's home to group homes and foster care. During this period, the caseworker regularly had complete supervision and control over plaintiff and took advantage of this authority to isolate plaintiff. He would meet alone with plaintiff on weekends and transport him in a County-issued car to residential facilities, court appointments, and "outings."
From the beginning, the caseworker started grooming plaintiff. As typical for a child sexual predator, the caseworker would give plaintiff gifts and cigarettes to gain his trust. He would also leave pornographic materials in the car and encourage plaintiff to look at them. Soon he began touching plaintiff's genitals and demanding that plaintiff touch his. The caseworker also threatened plaintiff, claiming he would be removed from his mother's home and placed in a jail-like environment if he told anyone or rejected the caseworker's advances. The caseworker's predatory actions quickly escalated from sexual touching to oral sexual conduct and attempts at anal sex. According to plaintiff, the caseworker would drive him to a hotel/motel or park the car on a back road to commit this abuse. Facing the caseworker's threats and his own trauma, plaintiff did not report his experiences until decades later.
The abuse continued without interruption or intervention by the County or any of its agents or representatives. Then, in 1996, several other child sexual abuse allegations were lodged against the caseworker involving other boys placed in his care along with plaintiff. The caseworker was eventually convicted of sex crimes related to those other allegations and died in prison in 2001.
Plaintiff alleged that, as a result of the caseworker's sexual abuse, he suffered "great pain of mind and body, severe and permanent emotional distress, and physical manifestations of emotional distress." Putting it in larger context, plaintiff asserted that he "was prevented from obtaining the full enjoyment of life."
II.
The County moved for summary judgment, relying on depositions of plaintiff and the caseworker's supervisor, and the deposition and affidavit of the DSS Commissioner. The submissions documented the caseworker's initial employment with the County in 1979 as an administrative assistant in a youth program and his [*6]eventual appointment as a DSS caseworker in the Foster Care Preventive Unit in 1987. The County initially hired the supervisor as a caseworker in 1968. Years later, she was appointed to supervisor and oversaw the caseworker. The Commissioner testified that the supervisor was "pretty diligent" in ensuring that she and her supervisees completed what the State required, and that the supervisor monitored her caseworkers "pretty closely and had day-to-day action [sic] with most of them." The supervisor stated that she received information about her subordinates' cases on "a self-reporting kind of system." The County argued that the record established that it was not aware of the caseworker's pedophilic propensities until 1996, when allegations surfaced that the caseworker sexually abused other boys.
Plaintiff opposed the motion, relying on the supervisor's deposition, which included statements that she never received specific course training on sexual abuse; instead, she stated, "it's like you learn by doing." When the supervisor was first employed, the County did not have a handbook for caseworkers, and individuals interpreted the State guidelines without County assistance. Over the years they "learned by the seat of [their] pants, really, as through experience."
The supervisor further explained that her child services unit—which was responsible for plaintiff—sought to establish a relationship with the children in their care, "to build trust and openness" so that they would talk to the caseworkers and supervisor. They had no formal process for filing complaints about caseworkers and her office had received none until the caseworker's abuse of other children came to light. But if a child, their family member, or someone else wanted to file a complaint, they could contact a supervisor. The supervisor was emphatic that, until the caseworker's abuse was revealed, she "was never, never aware of any caseworker that [she] ever worked with that would have been complained about."
The supervisor admitted that although she was supposed to review the caseworkers' notes in case files, she did not review the files "as regularly as [she] should have" and "didn't necessarily have the time to sit down and read every note." But she asserted that she met regularly with the caseworkers and that she never had a concern about anything said during her meetings with any of them.
Regarding the use of County-issued vehicles and time caseworkers spent alone driving the child in their care, the supervisor explained that caseworkers were supposed to keep a record of where they drove them, and while they might make a stop for lunch, caseworkers otherwise had to transport the child only to approved locations. The supervisor could not recall whether caseworkers would maintain these records outside of the casefiles.
Plaintiff also submitted an expert affidavit and report addressing what the expert concluded were several failures in DSS's hiring and supervision of the caseworker and its recordkeeping. The expert—a longtime scholar of child services, investigator of child abuse, and former caseworker—averred that the caseworker's supervisor was unqualified for her child welfare supervisory position and, after being hired, received inadequate training. Before hiring the caseworker in the Children's Services Unit, the County failed to conduct a background check or request reference letters. Measured against child welfare standards of the time, the County maintained low expectations for staff background checks, informal standards for case assignment and for caseworker/client visitation, contacts, and supervision. The documents produced in discovery did not include any notes documenting the caseworker's interactions with plaintiff, his family, or relevant professionals, nor any details of plaintiff's and the caseworker's trips to the group homes. The DSS Commissioner during the period of plaintiff's abuse did not initiate an internal investigation to determine the scope of the abuse of other children in his care when the caseworker was arrested. County records showed that plaintiff—then around 11 or 12 years old—engaged in behavior including setting fires; arguing; exposing himself to female peers at a group home; and wearing diapers to bed at home, in which plaintiff would urinate and which he would hide in the house along with his urinated clothing. However, no records indicated that the County had addressed the possibility that this behavior might be symptomatic of plaintiff having suffered sexual abuse.
In his memorandum in opposition to the motion, plaintiff argued, in part, that there was a triable issue of fact as to the alleged negligent supervision of the caseworker. Plaintiff contended that the County had its "head in the sand" with respect to the caseworker, even as plaintiff "was exhibiting the obvious signs of a child who had been sexually abused." In addition to the deficiencies identified by the expert, plaintiff noted that County failed to require the caseworker to document his car trips with plaintiff and did not provide guidelines for caseworkers or their [*7]supervisors meant to prevent or identify sexual abuse by County employees. Plaintiff further argued that had the County adequately supervised the caseworker, including in his interactions with plaintiff, the County might have discerned that the caseworker was taking anomalously long car trips with plaintiff, driving him to inappropriate locations, or keeping cigarettes and pornography in the County's vehicle.[FN1]
Supreme Court granted the County's motion and in a 3-2 decision, the Appellate Division affirmed (223 AD3d 1025 [3d Dept 2024]). The Appellate Division concluded that plaintiff failed to present evidence of the County's constructive notice of the caseworker's sexual propensities (id. at 1028). The dissent maintained that plaintiff identified a question of fact as to the County's negligent supervision of the caseworker, based on the lack of documentation of the caseworker's interactions with plaintiff and the supervisor's reliance on the caseworker's self-reporting (see id. at 1029-1030 [Lynch, J.P., dissenting]). The dissent reasoned that "[h]ad the supervisor actually reviewed [the caseworker's] notes, she would have learned that [they] failed to document any interaction with plaintiff—an omission that presented a genuine concern as to [the caseworker's] conduct and the safety of the child" (id. at 1030). As a result, the caseworker "was left in a position to cause foreseeable harm that could have been avoided had more diligent supervision efforts been made" (id.). I agree with this conclusion and would hold that the County was not entitled to summary judgment on plaintiff's negligent supervision claim, because triable issues of material fact exist as to whether the County created a culture of laxity that facilitated the caseworker's predation.
III.
A.
"On a motion for summary judgment, facts must be viewed in the light most favorable to the non-moving party. The movant must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact. Once this showing has been made, . . . the burden shifts to the party opposing the motion for summary judgment to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action" (Bazdaric v Almah Partners LLC, 41 NY3d 310, 316 [2024] [internal quotation marks and citations omitted]). Summary judgment is a "drastic remedy" only granted when "the moving party has 'tender[ed] sufficient evidence to demonstrate the absence of any material issues of fact' " (Vega v Restani Const. Corp., 18 NY3d 499, 503 [2012], quoting Alvarez v. Prospect Hosp., 68 NY2d 320, 324 [1986]). Where there is "any doubt as to the existence of such issues or where the issue is 'arguable,' " summary judgment is inappropriate (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957] [citation omitted], quoting Barrett v Jacobs, 255 NY 520, 522 [1931]).
"Where [a] negligence claim relates to an employer's retention and supervision of an employee," the plaintiff must ultimately prove that:
"(1) the employer had actual or constructive knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm; (2) the employer knew or should have known that it had the ability to control the employee and of the necessity and opportunity for exercising such control; and (3) the employee engaged in tortious conduct on the employer's premises or using property or resources available to the employee only through their status as an employee" (Moore Charitable Found. v PJT Partners, Inc., 40 NY3d 150, 157 [2023]).
These elements are additional to the usual requirements in a negligence case that a plaintiff show "a duty owed to the plaintiff by the defendant, a breach of that duty, and injury proximately resulting therefrom" (id.).
B.
Regardless of whether the County met its initial burden on summary judgment, plaintiff identified triable issues of material fact as to whether the County's conduct or inaction constituted negligent supervision. The parties' respective submissions demonstrate lax supervision largely reliant on self-reporting, which a factfinder could readily conclude constituted a breach of the County's duty of care. Moreover, the County's own dereliction insulated its personnel from the very information that might have uncovered the caseworker's abuse. Thus, a trier of fact alone must determine whether the County should have been on notice of a foreseeable harm to plaintiff from the caseworker's conduct.
The caseworker had control over plaintiff and the County permitted him to spend lengthy, undocumented periods of time alone with him, without another adult present. The supervisor admitted she did not read the case files as regularly as she should have and that she relied on her informal oral communications with the caseworkers.[FN2] This self-reporting system all but ensured that a predator like the caseworker would have unfettered opportunity to groom plaintiff and other children in his care—which he did. Although the supervisor asserted that her goal was to develop a rapport with the children so they would talk to caseworkers and the supervisor, she made no mention of any ongoing discussions with plaintiff or his parents—meetings that might have identified problems with the caseworker. Without the County's support, plaintiff was all the more susceptible to the caseworker's threats.
At oral argument, counsel asserted that the County had access to these records and was prepared to track plaintiff's progress. And although counsel stated that the County "was on top of it," the expert's report and the underlying records put that assertion in doubt. As the expert opined in his report, "the [d]efendant demonstrated a naïve but reckless indifference to [plaintiff's] condition and circumstances through its actions and inactions in hiring, supervision and documentation. This reckless indifference was responsible for giving [the caseworker] access and multiple opportunities to intimidate, threaten, and sexually assault" plaintiff.
The majority suggests, and the County argues, that we should not measure its actions by today's standards because child sexual abuse was not well understood when plaintiff alleges the abuse occurred. That assertion is inaccurate, as sexual abuse of children was both reported and prosecuted in the 1990s. Indeed, in 1992, the United States Supreme Court decided White v Illinois (502 US 346 [1992]), a child sexual abuse case. And well before then, this Court had decided a host of cases involving the same subject matter (see e.g., People v Gagnon, 75 NY2d 736 [1989]; People v Beauchamp, 74 NY2d 639 [1989]; Matter of Christina F., 74 NY2d 532 [1989]; Matter of Block v Ambach, 73 NY2d 323 [1989]; People v Hudy, 73 NY2d 40 [1988]; People v Groff, 71 NY2d 101 [1987]; People v Keindl, 68 NY2d 410 [1986]; People v Owens, 63 NY2d 824 [1984]; People v Shapiro, 50 NY2d 747 [1980]; People v Fielding, 39 NY2d 607 [1976]; People v Colclough, 32 NY2d 227 [1973]; People v Linzy, 31 NY2d 99 [1972]; Missouri Realty Corp. v New York State Liq. Auth., 22 NY2d 233 [1968]; People v Lo Verde, 7 NY2d 114 [1959]; People v Belcher, 299 NY 321 [1949]). There were also scholarly articles discussing the increasing number of reports of child sexual abuse, including a 1993 report sponsored by the United States Department of Health and Human Services (see Ellen Gray, Unequal Justice: The Prosecution of Child Sexual Abuse [1993]). As this Court explained in 1987, "[i]n recent years, preventing the sexual abuse of children," had "become a major social and judicial concern" (Matter of Nicole V., 71 NY2d 112, 117 [1987]). But even if the County were correct as to sexual abuse, it concedes that physical abuse of children was long well known by 1993, and it has failed to show that its supervision would have identified the noted red flags of plaintiff's physical—albeit sexual—abuse.[FN3]
Contrary to the majority's assertion, it is not speculative to conclude that reasonable supervision might have uncovered the caseworker's abusive conduct (see majority op at 9, 11-12). The expert report suggests that plaintiff's troubled behavior at the group home should have been evaluated by the County as potential symptoms of sexual abuse. The County admittedly did not do that. Moreover, by requiring written reports from the caseworker and by maintaining contact with plaintiff and his parents, the supervisor might well have uncovered anomalies in the caseworker's verbal self-reports. The supervisor also would have had to evaluate whether the caseworker's failure to record his trips with plaintiff was suspicious and whether he was making unapproved stops and taking an inordinate amount of time alone with plaintiff. Regardless of whether the County used these records to track vehicle availability (see majority op at 9), the supervisor admitted that the caseworker could only transport the child from one approved location to another and so it was incumbent upon her to use any available records to confirm the caseworker's business travel.[FN4]
The record establishes that neither the supervisor nor anyone else was watching over plaintiff to ensure his safety. The fact that several other boys were sexually abused by the caseworker at the same time as plaintiff further supports his claim that, at a minimum, there is a triable issue of material fact that the County was negligent in adequately supervising the caseworker. As we have stated, "an employer cannot avoid liability for negligent supervision and retention by shutting its eyes to the tortious practices and propensities of its employees—that is, by being doubly negligent" (Moore Charitable Found., 40 NY3d at 158).
IV.
Plaintiff asserts, and the record supports, that there is a triable issue of material fact as to whether the County's own negligence prevented it from learning of the caseworker's abusive conduct and, as a result, from preventing foreseeable harm from the caseworker's sexual predation. The majority misapplies our established summary judgment standard here, going beyond "issue-finding" to "issue-determination" (Sillman, 3 NY2d at 404). In so doing, the majority thwarts the legislature's intent under the CVA to provide plaintiffs and other child victims of sexual abuse an opportunity to hold accountable the abuser and those parties who share responsibility due to their negligence.
It is surely the case that the County and government agencies across the State face difficult challenges in ensuring that the children in their care are safe. But that is their responsibility, and it requires that they adopt and implement an operational system intended to alert management of potential risks of abuse. Plaintiff alleges that the County was negligent in its supervision of the person who abused him, and its lax culture of informal self-reporting fell below any reasonable standard of child protection. He should be able to make that case to a jury.
Order affirmed, with costs. Opinion by Chief Judge Wilson. Judges Garcia, Singas, Cannataro, Troutman and Halligan concur. Judge Rivera dissents in an opinion.
Decided April 17, 2025

Footnotes

Footnote 1: Mr. Nellenback's complaint also included claims for vicarious liability, respondeat superior, in loco parentis, breach of fiduciary duty, breach of non-delegable duty, and punitive damages. Mr. Nellenback agreed those claims should be dismissed. 

Footnote 2: The Appellate Division unanimously rejected Mr. Nellenback's negligent hiring claim, and Mr. Nellenback does not challenge that portion of the court's decision.

Footnote 3: Mr. Nellenback also over-relies on Ms. Hogg's statement that she failed to review records "as regularly as [she] should have." The record reveals that Ms. Hogg did, in fact, review notes. When asked "did you look at your case workers' case files regularly?", Ms. Hogg responded: "Not as regularly as I should have, but yes." Mr. Nellenback's contention that the complete absence of notes would have tipped Ms. Hogg off to the abuse thus goes nowhere, because Ms. Hogg reviewed some notes. The dissent's claim that "whatever notes existed, the supervisor did not read them" (and therefore it is "beside the point" that there is no evidence that Mr. Hoch failed to keep notes) is thus contradicted by the record evidence (dissenting op at 11, n 2). Additionally, Ms. Hogg testified that she met "very regularly" with caseworkers to discuss their cases and "was very much aware of what [they] were doing."

Footnote 4: The dissent asserts that this "self-reporting" system was in itself negligent, as it "all but ensured that a predator like the caseworker would have unfettered opportunity to groom plaintiff and other children in his care" (dissenting op at 11). The dissent's argument, like Mr. Nellenback's, fails to appreciate the limited role of caseworkers and the purpose of the notes that caseworkers were expected to keep. Moreover, the question is not whether Mr. Hoch had the "opportunity" to abuse children, but rather, whether there is anything in the record to suggest the County had a constructive notice of the abuse.

Footnote 5: In Moore, we held that, to establish constructive knowledge of an employee's dangerous propensities, employers need not have "actual knowledge of multiple past acts by the employee similar to those alleged in the complaint," but rather, it was sufficient to prove an employer "ha[d] reason to know of the facts or events evidencing that propensity" (id. at 158, citing Detone v Bullit Courier Serv., Inc., 140 AD2d 278, 279 [1st Dept. 1988]). In that case, clients of an investment bank sued a bank for fraud under a negligent supervision theory, alleging that the bank was on notice of the employee's fraudulent propensities where the employee "engaged in excessive drinking and obsessive personal stock trading during work hours," gave a "transparently false response" when asked about a missing $1.8 million fee from a client, and made a "purportedly sloppy attempt to cover up his embezzlement of that fee." However, we reaffirmed Brandy B.'s holding that "[f]or prior conduct to provide notice of an employee's propensity to commit a tort, that conduct must be 'similar to the [] injury-causing act,'" and explained that the allegations of the employee's drinking and gambling problems, "d[id] not, standing alone, justify an inference that defendants should have known of [the employee's] propensity to commit fraud" (id. at 159). Here, Mr. Nellenback has adduced no evidence of any prior conduct that could have led the County to foresee the harm. 

Footnote 6: The dissent refers to a statement in Dr. Nunno's expert report that points to "plaintiff's troubled behavior at the group home," which the dissent asserts "should have been evaluated by the County as potential symptoms of sexual abuse" (dissenting op at 13, 7-8). Initially, Mr. Nellenback has not contended that knowledge of his behaviors in the group homes should be attributed to the County, or that any group home alerted the County of those behaviors. Likewise, Dr. Nunno did not opine that there was anything in Mr. Nellenback's behavior at the group homes that the County should have evaluated for signs of sexual abuse. Furthermore, Dr. Nunno's statement apparently refers to documents he reviewed concerning Mr. Nellenback's time at one of the group homes that are not part of the record, with no indication those documents were contemporaneously provided to the County. Although inferences must be drawn in favor of the non-movant (and summary judgment is inappropriate "'where . . . competing inferences may reasonably be drawn'" [dissenting op at 14-15, n 4, citing Myers by Myers v Fir Cab Corp., 64 NY2d 806 (1985)]), an inference is not "reasonable" when there is no basis in the record to support it.

Footnote 7: Contrary to the dissent's position, we must evaluate the reasonableness of the County's supervision and training by the then-prevailing standards, not today's (dissenting op at 12), and the dissent provides no basis for its claim that the County's supervision was "derelict . . . according to the standards of the day" (id. at 13, n 3). The fact that there was some understanding of child sexual abuse in the 1990s does not imply that the mechanisms for preventing and reporting it have not been enhanced over time. The standard of care is based on what was customary at the time (see e.g. Bethel v New York City Tr. Auth., 92 NY2d 348, 353 [1998] ["The objective, reasonable person standard in basic traditional negligence theory . . . necessarily takes into account the circumstances with which the actor was actually confronted when the accident occurred"]; see also Restatement [Second] of Torts § 283).

Footnote 8: Contrary to the dissent's claim, our holding does not impose a "heightened standard for constructive notice" for cases involving sexually abused children (dissenting op at 2). Instead, we are imposing the same standard for proving constructive notice that applies to all plaintiffs, irrespective of their injury. Proving anything is more difficult in a case where the underlying events happened 30 years ago as compared to one in which the events were recent; the standards are the same; the access to evidence is different.

Footnote 1: The majority misconstrues plaintiff's argument. According to the majority, plaintiff contends "that if [the supervisor] had been more diligent in reviewing employees' case notes, she would have realized that [the caseworker] was not taking any notes of his time with [plaintiff] and concluded that [the caseworker] was engaged in some untoward behavior with [plaintiff]" (majority op at 7). However, the supervisor's failure to ensure the caseworker kept proper notes was not the only alleged fault, or even the most important. Rather, plaintiff argues that these recordkeeping issues were symptomatic of what plaintiff's expert called "lax" supervision that allowed the caseworker "unfettered access to" plaintiff even after he manifested symptoms of abuse.

Footnote 2: Whether there is evidence that the caseworker failed to keep notes is beside the point: whatever notes existed, the supervisor did not read them (see majority op at 7-8).

Footnote 3: The majority observes that "the field of child sexual abuse prevention has evolved significantly in the past three decades" (majority op at 11). This is doubtless true. But such evolution does not insulate actors from liability. For one thing, previously prevailing norms might well have been inadequate. Indeed, "a whole calling may have unduly lagged in the adoption of new and available" protocols (The T.J. Hooper, 60 F2d 737, 740 [2d Cir 1932] [Hand, L., J.]). Moreover, plaintiff has furnished evidence that the County was derelict in preventing sexual abuse even according to the standards of the day. The majority's pronouncement that times have changed, without more, cannot justify insulating the County from potential liability.

Footnote 4: The majority identifies various points at which one might depart from plaintiff's reading of the record. For example, the majority states that the "record reveals" that the supervisor reviewed the caseworker's notes (majority op at 8 n 3); that caseworkers had a "limited role" reflected in "the notes that caseworkers were expected to keep" (id. at 8, 9 n 4); and that nothing in the record gave the County reason to know about the abuse notwithstanding the report of plaintiff's expert concerning plaintiff's "behavior at the group homes" (id. at 10 n 6). Such issues are precisely what our summary judgment standard commands must be decided by the factfinder (see Myers by Myers v Fir Cab Corp., 64 NY2d 806 [1985] ["summary judgment is inappropriate where, as here, competing inferences may reasonably be drawn as to whether defendant's conduct constituted negligence"]).