N.M. v State of New York (2025 NY Slip Op 25140)

[*1]

N.M. v State of New York

2025 NY Slip Op 25140

Decided on May 28, 2025

Court Of Claims

Marnin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on May 28, 2025
Court of Claims

N.M., Claimant

against
The State of New York, Defendant.

Claim No. 135890

For Claimant:
N.M., PRO SE
For Defendant:
HON. LETITIA JAMES, NEW YORK STATE ATTORNEY GENERAL
By: Dorothy M. Keogh, Assistant Attorney General

Seth M. Marnin, J.

Introduction
Claimant N.M., a pro se claimant, filed a claim against the State of New York seeking damages for the harm he experienced as a result of defendant's negligence.[FN1]
Claimant alleges that on October 29, 2020, Department of Corrections and Community Supervision's ("DOCCS") employees conducted an unauthorized strip frisk in violation of law and regulations. The [*2]unauthorized strip frisk occurred during an authorized cell search [FN2]
at Sing Sing Correctional Facility ("Sing Sing"). (Claimant's exhibit 5, claim at 1, ¶¶ 3 — 6.)[FN3]

N.M. contends that defendant was negligent in failing to adequately supervise its staff despite the fact that these unauthorized strip frisks had been an ongoing problem and defendant had known for at least four years that DOCCS employees were conducting unauthorized strip frisks during cell searches. Claimant alleges that DOCCS employees conduct during the unauthorized strip frisk of the claimant met the definition of sexual abuse as that term is defined under the Prison Rape Elimination Act ("PREA") (28 CFR 115.6 [8]) and violated Correction Law § 70 (2) (b)'s requirement that incarcerated individuals be treated humanely, § 137 (5)'s mandate that incarcerated individuals should not be "subjected to degrading treatment," and DOCCS Directive No. 4910 because DOCCS employees conducted the strip frisk without the express consent of the Deputy Commissioner for Correctional Facilities. N.M. also alleges that defendant caused negligent infliction of emotional distress in not properly addressing its employees conduct. N.M. seeks $7,000 in damages for the "recurring emotional trauma that is brought on by seeing these guards, in that [his] mind relives the degradation and humiliation he experienced when this violation was committed under threat of further violations if he did not comply." (Claimant's exhibit 5 at 5, ¶ 11.) In answering the claim, the defendant generally denied the allegations and asserted 11 affirmative defenses. (Defendant's exhibit B, Answer at 1 — 3.)
A unified trial of this claim was conducted virtually on January 22, 2025 utilizing the Microsoft Teams platform, with the Court presiding at the Court of Claims in New York, New York. The claimant appeared from Sing Sing Correctional Facility and the Assistant Attorney General appeared from her work location.
At trial, claimant testified on his own behalf and called Jessemar Taylor as a witness. N.M. offered into evidence six exhibits:
Ex. 1. Grievance No. 0610-20 dated October 29, 2020;
Ex. 2. Report from Inmate Liaison Committee by Sheldon P. Johnson to Inmate Grievance Program regarding retaliation and retribution dated December 9, 2020;
Ex. 3. Correspondence from claimant to Captain Barnes dated November 8, 2020 regarding strip frisk violation grievance no. 0610-20 and February 19, 2021, along with correspondence from Captain Barnes to N.M. dated March 1, 2021;
Ex. 4. Central Office Review Committee's decision denying grievance no. SS-0610-20 hearing date April 8, 2021; and
Ex. 5. Verified Claim filed on January 27, 2021
Ex. 6. Claimant's reply to answer dated March 29, 2021 and filed on April 20, 2021;
The State called Lieutenant Brian Bodge, a 35-year employee of DOCCS, as its only witness and offered two exhibits:
Ex. A. Department of Corrections and Community Supervisions Directive No. 4910 entitled Control of & Search for Contraband dated June 28, 2019; and
Ex. B. Verified answer dated and filed on March 1, 2021.
The parties consented to all eight exhibits which were received into evidence.
The defendant moved to dismiss the claim at the close of claimant's case and at the close of the State's case. N.M. opposed both motions. The Court reserved judgment.
Following trial, the claimant sought, pursuant to CPLR § 3025 (c), to amend his claim to conform to the evidence presented. Specifically, N.M. wished to amend his claim to update the name of one of the sergeants he identified from Nunez to Muniz. Although the State asserted that there was no evidence received by the Court to support claimant's request, the State did not object to claimant's request to change the sergeant's name in his pleadings but sought assurances that no adverse inference would be drawn by Sergeant Muniz not appearing as a witness. N.M. objected to the defendant's assertion that no adverse inference should be drawn because, to summarize his arguments, this was information that has been in defendant's possession the entire time and, despite claimant's efforts to obtain the information before filing the claim, he was unable to receive accurate information.
Relevant Testimony and Findings of Fact [FN4]
N.M. credibly recounted that he was in his cell on October 29, 2020 when officers approached and told him that they were there to search the cell and initially directed him not to move. The first officer positioned himself at the rear of the cell and the second officer positioned himself at the entrance of the cell. N.M. was then directed to stand up and give them his clothing so that they could check it for contraband. N.M. complied with the directive and when he got down to his boxers, he was told to remove his boxers also. N.M. initially declined to remove his boxers and attempted to ascertain whether a strip frisk had been authorized. N.M. was told "this is what we do when we do these cell searches." N.M. responded that the request was unlawful because authorization by the deputy commissioner is required for a strip frisk. N.M. then asked to speak with a sergeant. The officers radioed for a supervisor to come to the cell.
Two sergeants responded and when they arrived, N.M. explained to them that the officers had asked him to strip naked and conduct a visual cavity search and that it had not been authorized by a deputy commissioner. One of the sergeants responded by asking "is the deputy commissioner here?" to which N.M. responded "no, he isn't." In response, N.M. recalled, the sergeants told him to "shut the f up and do whatever the f my officers tell you to do."[FN5]
 Given the language, tone, and demeanor used by the sergeant, N.M. believed he was potentially in danger [*3]at that point if he did not comply. He noted his objection, that the officers' demand was not consistent with the rules, but complied with the directive to strip down. Once he took his boxers down, the officer in front of him directed him to open his mouth, raise his genitals, show the officers his armpits, and raise his feet so the officer could inspect the bottoms of his feet. The officer behind him then directed him to squat which he again did as instructed. After he squatted and stood up, one of the sergeants, Sergeant "Nunez," then directed him to "bend over at the waist and spread [his] cheeks; do it correctly." Upon complying, the sergeant remarked "Ah, ok. That's right. That's how it's done." N.M. was then told to get dressed and was placed outside the cell while the officers searched his cell. N.M.'s cell only has bars, there is no door and no privacy curtain.
While outside his cell he observed that several cells on the company were being searched. After the cell searches concluded, N.M. learned others had also been subjected to the same unauthorized strip frisks as he had.
N.M. described how he researched the law, rules, and regulations and that he and the others filed grievances to make a record of what happened to them, particularly since he had heard that it was happening to others too. Captain Barnes was assigned to investigate the grievances. N.M. explained to Captain Barnes what had happened to him and explained that it was an ongoing problem with the hope that Captain Barnes would take action and prevent it from happening again. N.M. testified that Captain Barnes explained to him that the officers had been authorized to conduct the cell search but not authorized to conduct the strip frisk.[FN6]

N.M. testified that in his research, he also learned that when a strip frisk is conducted, officers are required to complete a Form 1140. N.M. requested a copy of the form that should have been completed when he was subjected to the strip frisk however was told that no 1140 form existed because the officers denied conducting a strip frisk. N.M. appealed to Albany and the appeal was denied, citing the officers' denials of the strip frisk and their explanation that what had occurred was a clothing exchange, not a strip frisk.
Frustrated by his own and other individuals' unsuccessful efforts to effectively address the defendant's negligent behavior, N.M., described how, on December 6th, less than two months after the incident, he and other incarcerated individuals decided to bring attention to this ongoing issue of unauthorized, abusive strip frisks. N.M. recounted how individuals housed on A-block did not leave their cells: they did not go to recreation, they did not go to the gym, and they did not use the phones, or use the kiosks. (See also claimant's exhibit 2.)
N.M. also learned in his research that others had previously made complaints to DOCCS about unauthorized and abusive strip frisks during cell searches. N.M. identified a grievance from as far back as 2016 and included the number of that grievance in his claim. (Claimant's exhibit 5, claim at 2.) N.M. also credibly testified — and the defendant did not contradict — that following the demonstration and in response to the complaints and protests over unauthorized and abusive strip frisks, DOCCS changed the composition of search teams and female correction officers began to be included on cell-search teams in an attempt to eliminate or at least reduce these unauthorized strip frisks.
N.M. testified affectingly about how this kind of abuse distressed him mentally, particularly when there was no justification for the invasive search. He observed that it was easier to stomach when there was a rationale, but without explanation, it is deeply humiliating and described it as an assault on his manhood, his personhood, and his humanity. N.M. experienced it as a message from the officers: that they can do what they want, he is powerless to object, and that if he resists it will be worse. N.M. referenced the incarcerated individual who had recently been beaten to death at Marcy Correctional Facility by correction officers. Although the incident occurred nearly four years after incidents alleged here, N.M. explained how reports over the years of incidents like that shaped his experience of and reaction to the unauthorized strip frisk and his fear that it — or worse - would occur again. This has been particularly true for N.M. since he still regularly sees the abusive sergeant at Sing Sing.
N.M.'s witness, Jessemar Taylor who is also incarcerated at Sing Sing, testified that in 2020 he also experienced cell searches and described a strip frisk that occurred approximately a month after claimant's. Mr. Taylor offered a similar and credible description of one officer in the front of his cell and one at the back and being directed to remove his clothing. He also filed a grievance and an investigation was conducted by Captain Barnes. Here too officers denied conducting a strip frisk and his grievance was denied.
Mr. Taylor also corroborated claimant's testimony about the day in December 2020 that the men on A-block stayed locked in. He stated there was not much movement. Mr. Taylor also shared similar fears regarding "beat downs" by officers and other forms of retaliation for having filed the grievance. On cross-examination, Mr. Taylor described various ways he had been retaliated against by correction officers, including being keeplocked within weeks of filing the grievance although acknowledged that he was not explicitly told it was in retaliation. On re-direct, Mr. Taylor described being keeplocked, not given a ticket, and not afforded a hearing, all in retaliation for grieving the strip frisk.
Lieutenant Bodge testified on behalf of the State. Lieutenant Bodge explained that the two officers, one of the sergeants, and the captain who investigated the grievance, all of whom were identified by name in the claim, were, for various reasons, no longer employed by DOCCS. The second sergeant involved in the strip frisk, the one who was described by claimant as saying, "shut the f up and do whatever the f my officers tell you to do" and then directed him to "bend over at the waist and spread [his] cheeks; do it correctly," and upon complying, the same sergeant remarked "Ah, ok. That's right. That's how it's done" was identified as Sergeant "Nunez" in the claim although it was revealed at trial that his name is Sergeant Jose A. Muniz.[FN7]

Lieutenant Bodge credibly testified that, although he had no first-hand knowledge of what occurred, the denial of N.M.'s grievance stated that "a clothing exchange was conducted on 10/29/20, not a strip frisk as alleged." (Claimant's exhibit 4.) Lieutenant Bodge also explained what occurs during a "clothing exchange": an incarcerated individual removes his shirt and pants but is not required to remove his underwear. (See also, Directive 4910 [IV] [A] and [D] ["the (incarcerated individual) will not be required to remove his or her underwear" in a clothing [*4]exchange].) The State offered no documents or other records into evidence (contemporaneous logbooks, etc.) to account for what transpired on that date with N.M..
When asked about the December 6, 2020 evening described by claimant where the men on HBA chose not to come out of their cells, use the phone, or the kiosks, although Lieutenant Bodge had no particular recollection of that evening, he testified that in December 2020 the movement of incarcerated individuals was limited because of COVID-19 restrictions but had no knowledge of any demonstration by incarcerated individuals because of frustrations over unauthorized or improper cell searches. Lieutenant Bodge further testified that he was unaware of any sustained effort by staff to conduct unauthorized strip frisks on that date or ever.
The Law and Analysis
It is well established that, "because correction officers are tasked with the formidable and critical responsibility of protecting the safety of incarcerated individuals, . . . when that obligation is breached, the State may be directly liable for injuries suffered by an incarcerated individual if it acted negligently" (R.S. v State of New York, 231 AD3d 1376 [3d Dept 2024] [internal quotation marks, citation and brackets omitted]). Therefore, this claim, as with any negligence claim, requires the Court to determine whether the defendant owed a duty to claimant, whether there was a breach of that duty, and a resulting injury. (Nellenback v Madison County, ___NY3d___, 2025 NY Slip Op 02263, *1 [2025] [a claimant bringing a negligence action must raise and prove that defendant owed a duty to the claimant, there was a breach of that duty, and injury proximately resulted therefrom]; A.J. v State of New York, 231 AD3d 237, 239 [3d Dept 2024]; Reese v Raymond Corp., 202 AD3d 1304, 1307 [3d Dept 2022].)
Was there a duty?
Because the State has assumed physical custody of incarcerated individuals who are unable to protect and defend themselves against others in the same way that those at liberty can, the State owes a duty of care to protect them. (Sanchez v State of New York, 99 NY2d 247, 252 [2002]; R.S. v State of New York, 231 AD3d 1376, 1376 [3d Dept 2024].) This is true even where — or, perhaps especially when — those against whom they are defending themselves are correction officers or others employed by the State. (R.S. v State of New York, 231 AD3d 1376, 1376 [3d Dept 2024]; Aliaga v State of New York, 84 Misc 3d 1246[A], 2024 NY Slip Op 51694[U], *33 [Ct Cl, 2024].) However, that duty is not absolute and does not render the State an insurer of incarcerated individuals' safety and well-being. (Sanchez v State of New York, 99 NY2d 247 at 253.) Rather, the State's "duty is limited to providing reasonable care to protect [incarcerated individuals] from risks of harm that are reasonably foreseeable, i.e., those that [DOCCS] knew or should have known" (Vasquez v State of New York, 68 AD3d 1275, 1276 [3d Dept 2009] [citations omitted]; see Smart v State of New York, 65 AD3d 1218 [2d Dept 2009] [the State will be liable for negligence only if "it failed to exercise adequate care to prevent that which was reasonably foreseeable"] [internal citations and quotations omitted]). Constructive knowledge, that the State "should have known," "includes whatever information the State reasonably should have known from its knowledge of the risks to a class of [incarcerated individuals] based on its institutional expertise, its prior experience, and its policies and practices." (McDevitt v State of New York, 197 AD3d 852, 854 [4th Dept 2021] [internal citation omitted]; see R.S. v State of New York, 231 AD3d 1376, 1377 [3d Dept 2024].)
Claimant references the duties outlined in New York Correction Law § 70 (2) (b)'s [*5]requirement that incarcerated individuals be treated humanely, § 137 (5)'s mandate that incarcerated individuals should not be "subjected to degrading treatment," and DOCCS Directive No. 4910's requirements to obtain the express consent of the Deputy Commissioner to conduct a strip frisk as evidence of the State's duty.
Correction Law § 70 (2) (b) gives DOCCS wide latitude in establishing facilities, programs, and treatment of incarcerated individuals and creates a duty to do so "with due regard to . . . the right of every person in the custody of the department to receive humane treatment." Similarly, Correction Law § 137 (5) provides for a corresponding duty that incarcerated individuals are treated humanely.
DOCCS Directive No. 4910 defines, among other matters, the various types of personal searches that may be conducted by DOCCS employees in its efforts to search for and control contraband, under what circumstances the searches may be conducted, and how DOCCS employees are expected to conduct themselves during the searches. The defined searches range from searches using a metal detector, to pat frisks, strip searches, and strip frisks, among others.
There appear to be three types of searches that are relevant to this claim and the State's defense: the clothing exchange, strip search, and strip frisk. According to Directive No. 4910 and relevant testimony, a clothing exchange is the least invasive and requires an incarcerated individual to remove their clothing so that their clothing can be inspected, but does not require an incarcerated individual to remove his underwear nor does it include inspection of an individual's mouth, ears, hair, hands, armpits, and feet, nor their genitals. According to Directive 4910, a clothing exchange would occur when an incarcerated individual is received by another facility, whether in general population or in a Special Housing Unit, and the receiving facility determines it is necessary. (Defendant's exhibit A at 13 — 14.)
A strip search and strip frisk are similar to each other. A strip search involves the search of an individual's clothing, a visual inspection of an individual's naked body, and may include the inspection of his mouth, ears, hair, hands, armpits, and feet. What distinguishes a strip frisk from a strip search is that during a strip frisk, an individual will be required to lift his testicles to expose the area behind his testicles and bend over and spread his buttocks in order to expose his anus to the frisking Officer. (Defendant's exhibit A at 7 — 8.)
Directive 4910 identifies under what circumstances strip frisks and strip searches may be conducted. During a routine block search (Directive 4910 [V] [B] [1]) strip searches are authorized and during routine cell searches (Directive 4910 [V] [B] [3]) pat frisks, which involves an officer running their hands over the outside of an incarcerated individual's clothes but does not require the individual to take their clothes off, are directed and hand-held metal detectors are permitted. Pat frisks are also directed where individuals are present for a routine area search (Directive 4910 [V] [B] [2]) and hand-held metal detectors are permitted here too. Although it is not entirely apparent what distinguishes a routine block search from a routine cell search, it is evident that none of these authorizes a strip frisk.
During a routine area search, strip searches and strip frisks "may not be conducted without the expressed [sic] consent of the Deputy Commissioner for Correctional Facilities." (Id.) Unscheduled/Response-Type area searches (Directive 4910 [V] [C] [1]) also include the prohibition against conducting strip searches and strip frisks without the express consent of the Deputy Commissioner for Correctional Facilities. However, the bar for strip frisks during routine block searches and routine cell searches is not that high. Rather, where an officer believes an incarcerated individual is hiding contraband, they may conduct a strip frisk but only if they [*6]obtain permission to do so from an officer with the rank of sergeant or above. The Directive sets out a reasonable person standard for the sergeant, requiring that the sergeant have "information that would lead a reasonable person who possesses the same expertise as the official to believe under the circumstances that the [incarcerated individual] is hiding contraband" on or in his body. (Directive 4910 [III] [F] [2].) The Directive goes on to say that "[m]ere suspicion or belief, unsupported by articulable fact, is insufficient." (Id.) If the sergeant finds probable cause and directs the officer to conduct the strip frisk, the sergeant must complete the "Report of Strip Search or Strip Frisk" Form and "[t]he Sergeant or higher ranking Officer must sign this report." (Directive 4910 [III] [F] [3][emphasis in original].)
Strip frisks are only explicitly authorized without additional justification or consent upon being transferred from one DOCCS facility to another (Directive 4910 [IV] [A] and [D] [3]), after a contact visit (Directive 4910 [IV] [B]), when they are received in a Special Housing Unit (Directive 4910 [IV] [D] [1] [unless they are arriving from the SHU of another facility]), in connection with their admission to restriction/secure units (Directive 4910 [IV] [E] [1] and [2]), when admitted to an individual cell of psychiatric housing or when on suicide watch (Directive 4910[IV] [F] [1] and [2]), after returning from a release without supervision (Directive 4910 [IV] [G]), when leaving the facility on an escorted trip an officer may enroute or upon return conduct a strip frisk under limited circumstances (Directive 4910 [IV] [H] [1-3]), and prior to entering a drug/special watch cell/room (Directive 4910 [IV] [J] [5] [d]). None of these circumstances is applicable here.
The Directive also provides guidelines for staff demeanor and expectations of privacy. Officers or others who conduct personal searches "must assure its thoroughness and not offend the dignity of the [incarcerated individual] being searched" and "refrain from . . . obscene language . . . during these searches" (Directive 4910 [III]); see also Directive 4910 [III] [G] [1] [c] ["Officers shall conduct themselves professionally . . . and conduct such searches in a manner least degrading to all involved"]). Directive 4910 [III] [G] [2] [a] requires that strip frisks are conducted in a location that provides privacy. Directive 4910 also requires, whether the strip frisk is explicitly authorized in the directive or needs the express consent of the Deputy Commissioner or sergeant, a form to be completed that documents the strip frisk. (Directive 4910 [III] [G] [5] [a] and [b].)
All of this is to say, it is evident throughout Directive 4910 that when a strip frisk is not explicitly authorized, as was the case here, it requires the express consent of the Deputy Commissioner or a sergeant, and a form must be completed documenting the strip frisk. And, whether or not it was explicitly authorized, it should have been conducted in a professional and non-degrading manner, and in a place that provided privacy. Taken collectively, Directive 4910, Correction Law § 70 (2) (a), and Correction Law § 137 (5) establish that the State had a duty to the claimant.
Did the State breach its duty?
Having found that there was a duty to claimant, the question now is whether the State breached that duty. N.M. maintains that defendant breached its duty to him when he was subjected to an unauthorized strip frisk. His credible testimony and the consistency of his description of what occurred: that officers directed him to strip naked when it was not [*7]authorized;[FN8]
that the sergeant directed him to follow the directive of the officers with no probable cause articulated; that the sergeant spoke to N.M. in a degrading manner and then subjected him to a strip frisk with no probable cause; the officers, under the supervision of the sergeants, conducted the strip frisk in an area that lacked the requisite privacy; and that the sergeant and officers did not properly document the strip frisk in the required report all support the conclusion that the State breached its duty to claimant.
Mr. Taylor did not witness the strip frisk of N.M. and his testimony about his own experiences with unauthorized strip frisks does not itself constitute evidence that N.M. experienced an unauthorized strip frisk as described in his claim and testimony. However, Mr. Taylor's testimony and the December 2020 letters admitted into evidence (see claimant's exhibit 2) collectively support N.M.'s testimony that this was an ongoing issue and that it occurred as N.M. described it. The Court understands that Mr. Taylor testified about an event that occurred following the incident underlying this claim and that the letters also were written following this claim, however the letters in particular reference ongoing issues with strip frisks over a period of at least many months.
The State maintains that there was no strip frisk. It insists that this was a clothing exchange and thus there was no breach. However, the defendant has offered no credible evidence or testimony to support this conclusion or to contradict claimant's testimony. Lieutenant Bodge's testimony that this was a clothing exchange does not refute claimant's testimony. Lieutenant Bodge had no firsthand knowledge of what occurred. He drew this conclusion from reading claimant's exhibit 4, the Central Office Review Committee's denial of claimant's grievance, concluding that N.M. experienced a clothing exchange during the "cell search" and not a strip frisk, despite the fact that clothing exchanges are not authorized during a cell search.
To the extent that the State argues that its actions were discretionary, Directive 4910 belies that assertion. While many decisions made and actions taken by DOCCS are discretionary and privileged,[FN9]
Directive 4910 makes it clear that the decision to conduct a strip frisk is not [*8]discretionary and particularly not under the circumstances presented here.
Addressing the question of foreseeability, that is, was it foreseeable that an officer or other employee of the defendant would breach their duty and could abuse their position or harm incarcerated individuals by conducting unnecessary, degrading strip frisks or conducting a strip frisk in a manner that was abusive and could be experienced as degrading? Directive 4910 answers that question. It is a directive that reflects policies and practices to guard against such risks. (See Sanchez v State of New York, 99 NY2d 247, 256 [2002]; Vasquez v State of New York, 68 AD3d 1275 [2009] [a policy mandate is evidence of foreseeability]; Di Donato v State of New York, 25 AD3d 944 [2006].) Moreover, N.M. provided in his verified claim and testimony that the defendant had been aware of the ongoing abuse of strip frisks since as early as 2016. And, indeed, N.M. testified that he explained to the officers and sergeants at the time of the strip frisk that it was in violation of DOCCS' policy. It was therefore foreseeable.
The penological purpose of strip frisks is self-evident. Indeed, it fulfills DOCCS' duty to incarcerated individuals and staff to ensure the safety of a facility (see Correction Law §§ 137 and 70 [2] [a] and [c] [DOCCS may establish and maintain a facility "with due regard to . . . [t]he safety and security of the community" and "[t]he health and safety of every person in the custody of the department"].) It is equally self-evident that the limitations to strip frisks articulated in Directive 4910, in particular the probable cause prerequisite, authorization requirements, and documentation requirements serve to prevent abuses by DOCCS, creating a duty to incarcerated individuals to follow the directives outlined. Violations or breaches of these directives serve no penological purpose. N.M. has therefore demonstrated by a preponderance of the credible evidence that defendant had a duty to claimant and that defendant breached that duty.
Did the breach of that duty cause harm to the claimant?
Having determined that the State owed a duty to the claimant and that it breached its duty, the question that remains is whether the breach caused N.M. harm. Defendant's assertion that N.M. did not testify to the harm caused by the defendant's breach is belied by the record. He powerfully and eloquently testified to the harm caused to his psyche as a result of the degrading and humiliating treatment during the unauthorized strip frisk conducted at the direction of a supervising officer; the fear of being assaulted because he initially did not comply and the recognition that further non-compliance could result in worse; the feeling of helplessness at not being able to stop the unlawful activity and the inability to prevent it from happening again; and the experience of reliving the humiliation and degradation every time he sees the officers involved. The law has been long settled that a claimant may recover for emotional harm even in the absence of physical injury. (Johnson v State of New York, 37 NY2d 378, 383 [1975].) The Court therefore concludes that N.M. has demonstrated that the State's breach of its duty has [*9]caused him harm.
The Court's conclusion that N.M. has proven by a preponderance of the evidence that the defendant was negligent and that defendant's negligence caused him harm, particularly N.M.'s emotional distress, including the humiliation, embarrassment, and anxiety he has experienced, claimant's cause of action for negligent infliction of emotional distress is duplicative and cannot — and, indeed, need not — be maintained. (See Afifi v City of New York, 104 AD3d 712, 713 [2d Dept 2013].)
Damages
Awarding damages for emotional distress is not a precise enterprise and there is no formula for the Court to apply. (McDougald v Garber, 73 NY2d 246, 257 [1989].) To the extent that comparable cases are available, they can help to guide the Court's consideration, but they are not binding. (Garcia v CPS 1 Realty, LP, 164 AD3d 656, 658 [2d Dept 2018].) Emotional distress awards vary widely depending on the particular facts and circumstances. Damage awards, as with any other type of factual finding is typically left to the fact-finder's common sense and judgment with respect to the evidence presented at trial, including the demeanor of witnesses. (Apuzzo v Ferguson, 20 AD3d 647, 648 [3d Dept 2005].)
Although no experts were offered at this unified trial by either claimant or defendant to address the harm that N.M. experienced, N.M. expressed the ways the unauthorized strip frisk has and continues to have an impact on him emotionally. He emphasized how deeply humiliating it was to him, describing it as an assault on his manhood and his humanity. He also spoke to the ongoing nature of the emotional harm, reliving it every time he sees one of the employees involved.
Having carefully considered the testimony and documentary evidence received at trial, as well as relevant law, the Court awards N.M. $7,000 in damages for the emotional distress he has experienced caused by DOCCS' negligence in causing the foreseeable harm inflicted upon him by conducting the unauthorized strip frisk.
The amount awarded herein shall carry interest at the interest rate of 9% per year from the date of the determination on May 28, 2025. In addition, to the extent claimant has paid a filing fee, it may be recovered pursuant to Court of Claims Act § 11-a (2).
Any motions on which the Court may have previously reserved or which were not previously determined are hereby DENIED.
The Chief Clerk is directed to enter judgment accordingly.
May 28, 2025
New York, New York
SETH M. MARNIN
Judge of the Court of Claims

Footnotes

Footnote 1:Upon careful review of the claim, the Court understands this to be a straightforward negligence claim. The Court does not believe that this claim was brought under the Prison Rape Elimination Act (PREA) and will not be analyzing it as such. Moreover, in carefully reading the claim and listening to the testimony, it is evident that claimant uses the phrases "properly supervise guard staff" and "negligent in supervising its officers" as lay terms. The distinction between negligent supervision as a legal theory and the legal doctrine of respondeat superior is not an obvious one, particularly not to a pro se litigant. The claim adequately states the nature of the claim as one for negligence, identifies the time when and place where the incident occurred, and the damages he sustained as a result of the defendant's negligence.

Footnote 2:The claim and testimony at trial by all witnesses refer to the search as a "cell search." However, the testimony did not identify whether this was a routine block search, a routine cell search, or an unscheduled/response-type search. As explained infra, none of these searches permit a strip frisk without permission from either a sergeant or the Deputy Commissioner, all require probable cause, and all require the strip frisk to be documented.

Footnote 3:For the purposes of consistency and clarity, page numbers for exhibits correspond to the page of the PDF.

Footnote 4:Unless otherwise indicated, all quotations are to the audio recording of the trial of this claim.

Footnote 5:Out of respect and decorum for the virtual courtroom, N.M. did not use the work "fuck" at trial but indicated that this was the word used by the sergeant.

Footnote 6:Captain Barnes' statement to N.M. is admissible pursuant to CPLR 4549 as it was within his scope of employment. (See BL Doe 5 v Fleming, 229 AD3d 1076, 1080 [4th Dept 2024].)

Footnote 7:Although the Court agrees with claimant that the defendant has been in a position to know all along that there was no Sergeant Nunez, the Court finds it unnecessary to draw any inference, adverse or otherwise, that Sergeant Muniz did not appear as a witness in deciding this case.

Footnote 8:If this was a routine cell search, the directive to remove all his clothing and to lift his testicles, squat, and bend over and spread his buttocks would have all been unauthorized and therefore all a breach of the State's duty. If this was a routine block search, a strip search would have been authorized and the breach would be limited to the directives to squat and bend over and spread his buttocks. In either case failing to complete the required form, using abusive language, and conducting the search in a non-private area would all be breaches of defendant's duty.

Footnote 9:The law is well-settled that when it comes to disciplinary matters, for example, the correctional facility employee's decisions are quasi-judicial in nature and are therefore entitled to absolute immunity. (See Arteaga v State of New York, 72 NY2d 212, 216 [1988]; Ramirez v State of New York, 175 AD3d 1635, 1635-1637 [3d Dept 2019].) That immunity attaches to the State so long as the underlying proceedings and decisions complied with the applicable governing rules and regulations. (Arteaga v State of New York, 72 NY2d 212, 218-220 [1988]; see also Gittens v State of New York, 132 Misc 2d 399, 402 [Ct Cl, 1986] [in the context of a prison involuntary confinement proceeding, such confinement will be privileged to the extent that it was under color of law or regulation].) However, even when it comes to disciplinary matters, immunity is lost where prison personnel exceeded their scope of authority, violated applicable rules or laws, or failed to implement required due process safeguards. (Moreland v State of New York, 200 AD3d 1362, 1364 [3d Dept 2021]; Ramirez v State of New York, 175 AD3d 1635, 1637 [3d Dept 2019].)