M.D. v State of New York (2025 NY Slip Op 25225)

[*1]

M.D. v State of New York

2025 NY Slip Op 25225

Decided on September 16, 2025

Court Of Claims

Marnin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on September 16, 2025

Court of Claims

M.D., Claimant,

against

The State of New York,
THE CITY UNIVERSITY OF NEW YORK,[FN1] Defendants.

Claim No. 138957

For Claimant:
CURIS LAW, PLLC,
By: Antigone Curis, Esq.

For Defendants:
HON. LETITIA JAMES, NEW YORK STATE ATTORNEY GENERAL
By: Akosua K. Goode, Esq.
Assistant Attorney General

Seth M. Marnin, J.

Claimant M.D. filed this claim against the State of New York and The City University of New York
("CUNY") under the Adult Survivors Act raising various negligence claims. Presently before the Court is defendants' motion for summary judgment pursuant to CPLR 3212 seeking an order dismissing the claim in its entirety.

Relevant Facts
M.D. was a community service enrollee/volunteer in the Materials Management department at CUNY Law School in 1990. (NYSCEF Doc. No. 52 at 40:5-6; 49:11-14.) She reported to Bennedict Isoh who was the Materials Coordinator of Materials Management,[FN2]
a department also known as Reprographics, at CUNY Law School. (NYSCEF Doc. No. 52 at 47:2; NYSCEF Doc. No. 53 at 12:6-8; NYSCEF Doc. No. 57 at 83.) Mr. Isoh oversaw the Materials Management department (NYSCEF Doc. No. 60, 24:21-24), including the interns who worked there. (NYSCEF Doc. No. 53 at 14:23-25.) Prior to this role at the law school, he had taught at Queens College. (NYSCEF Doc. No. 53 at 12:4-7; 13:5-7.) Carmen Rana, then an intern, a secretary named Patrice, a supervisor named Maria, a staff member named Marlow, and one other staff member also worked at Materials Management at this time. (NYSCEF Doc. No. 52 at 50:16-20; NYSCEF Doc. No. 60 at 18:21-25; 22:20-22; 23:3-14.)

Dave Fields was Associate Dean of CUNY Law School from 1984 until 2002 (NYSCEF Doc. No. 61 at 10:16-17; 11:3-4). As Associate Dean, Mr. Fields oversaw the administrative operations of the law school. (NYSCEF Doc. No. 61 at 10:20-24; 11:8-12.) William ("Bill") Williams, who reported to Dave Fields, was the Business Manager and directly supervised the Materials Management department. (NYSCEF Doc. No. 56 at 9:4-18; 21:3-9; NYSCEF Doc. No. 61 at 11:13-19; 12:8-9; 20:23-24; 23:6-7.) As the manager tasked with overseeing the Materials Management department, Mr. Williams was Mr. Isoh's immediate supervisor. (NYSCEF Doc. No. 53 at 15:16-18.)

Mr. Isoh recalled responding to an advertisement for the position. He participated in a series of interviews and was hired. (NYSCEF Doc. No. 53 at 23:23-24:2.) According to Mr. Fields, Mr. Williams ran the search and hired Mr. Isoh. (NYSCEF Doc. No. 61 at 21:6-11.) Mr. Fields did not himself vet Mr. Isoh but assumed that personnel did so. (NYSCEF Doc. No. 61 at 22:4-8.) Mr. Williams, however, recalled that Mr. Fields hired Mr. Isoh because Mr. Fields and Mr. Isoh had worked together at Queens College. (NYSCEF Doc. No. 56 at 19:14-19.)

Mr. Williams described Mr. Isoh as having "plenty of latitude" and "a free hand" running Materials Management because he knew what he was doing and Mr. Williams met with Mr. Isoh "[a]s needed." (NYSCEF Doc. No. 56 at 13:11-12.) Mr. Williams reflected that, because Mr. Isoh was responsible for his department making copies, in a certain manner, he was supervised [*2]by the person for whom he was doing the copying job. (NYSCEF Doc. No. 56 15:10-12.) Although Mr. Fields did not directly supervise Mr. Isoh, Mr. Fields went to the Materials Management department regularly — probably a couple of times a week — to get things. (NYSCEF Doc. No. 61 at 25:9-15.)

M.D. was a "community service enrollee/volunteer" at CUNY Law School as a result of a domestic dispute with a boyfriend. M.D. was on probation and fulfilling her required community service there. (NYSCEF Doc. No. 52 at 33:19-35:11.) She was scheduled to work at Materials Management three or four set days a week for four to six hours each day. (NYSCEF Doc. No. 52 at 42:24-25; 45:10-11; 45:14; 45:18-19.) When she first arrived at her CUNY Law School placement, she reported to her supervisor, Mr. Isoh. (NYSCEF Doc. No. 52 at 46:23-47:2; 48:25-49:14.) Her tasks in the Materials Management department included making copies, stacking papers, and working with the fax machine. (NYSCEF Doc. No. 52 at 52:20-24.) This was M.D.' first office job and Mr. Isoh was her first boss. (NYSCEF Doc. No. 52 at 53:17-21.)

In the first week M.D. was working there, M.D. describes Mr. Isoh as constantly complimented her on "everything" — her hair, tasks she completed, her smell, her cheekbones, and her dimples. He did this in front of the other staff who worked there. (NYSCEF Doc. No. 52 at 54:13-55:12.) Initially, M.D. was not bothered by the compliments, but they quickly began to make her uncomfortable. (NYSCEF Doc. No. 52 at 58:6-9.) During this first week she was working there, M.D. was never alone with Mr. Isoh, she was only in the main area of the copy office but did not go to his private office. (NYSCEF Doc. No. 52 at 56:3-23.)

When her second week began, M.D. recalls Mr. Isoh asking her to come to his private office to "discuss some things." (NYSCEF Doc. No. 52 at 60:6-13.) Mr. Isoh had a private office that was at the rear of the larger copy center at CUNY Law School (NYSCEF Doc. No. 53 at 13:23-25.) Mr. Isoh would summon her when she was in the main area with others around, and did not ask privately. (NYSCEF Doc. No. 52 at 122:2-5; 147:13.) Mr. Isoh's office was located down the hall from the main work area. (NYSCEF Doc. No. 52 at 63:11-14.) M.D. never went to his office unless summoned there by Mr. Isoh. (NYSCEF Doc. No. 52 at 156:16-17.)

M.D. interpreted the request to come to his office and discuss some things to mean that he wanted to talk about her probation and was providing privacy for the conversation. (NYSCEF Doc. No. 52 at 60:8-10.) Once in Mr. Isoh's office, M.D. sat in the guest chair in front of his desk while Mr. Isoh was behind his desk. He started complimenting her again. She also remembers him telling her that he could help get her a job at the law school. (NYSCEF Doc. No. 52 at 60:16-25; 72:10-15.) M.D. was excited by this prospect, to be potentially working in an office setting rather than at a fast-food establishment long-term. (NYSCEF Doc. No. 52 at 69:16-22.) Mr. Isoh moved around to the front of his desk, then touched her shoulder while telling her she was doing a great job and that she could have a future at the law school. (NYSCEF Doc. No. 52 at 61:3-17.) He then moved his hand down to her breast and began to fondle her breasts on the outside of her clothing. (NYSCEF Doc. No. 52 at 61:16-62:13; 73:8-9.) She pushed his hand away and told him to stop. He told M.D. to calm down and she left his office and returned to the main work area. (NYSCEF Doc. No. 52 at 62:5-14; 73:12-19; 75:23-25.)

Each day M.D. worked at Materials Management thereafter, M.D. recounts how Mr. Isoh brought her into his office and would raise M.D.' probation status with her. Mr. Isoh was aware that she was on probation because there had been paperwork related to her probation and community service that he received. (NYSCEF Doc. No. 52 at 84:2-10.) He seemed, as M.D. understood it, to be threatening her in order to keep her quiet about his behavior and warning [*3]M.D. that if she told her probation officer, the probation officer would believe Mr. Isoh and not her. (NYSCEF Doc. No. 52 at 68:5-16.) M.D. believed that Mr. Isoh would contact her probation officer and provide a negative report about M.D.. She thought that if the probation officer received a negative report, M.D. could get in trouble with her probation officer and possibly go to jail as a result. (NYSCEF Doc. No. 52 at 89:3-4; 91:6-12; 139:18-140:4.) Although she now understands that he likely could not have done this, she believed he could at the time. (NYSCEF Doc. No. 52 at 108:18-20; 142:2-13.) Mr. Isoh would make these threats when M.D. resisted his advances. (NYSCEF Doc. No. 52 at 106:5-16; 148:9-10.) M.D. was afraid to tell her probation officer what had been happening at the placement site because she thought she could get in trouble for it or would not be believed. (NYSCEF Doc. No. 52 at 93:20-94:12; 108:8-9.)

For the remainder of M.D.' time at CUNY Law School, every day she worked, Mr. Isoh would summon her into his private office. Whether she was scheduled for three days or four each week, she recalls being called back to his office every day she was there. (NYSCEF Doc. No. 52 at 85:5-8; 117:19-25; 156:7-9; 169:5-10.) On at least one occasion, Ms. Rana saw her going into Mr. Isoh's office (NYSCEF Doc. No. 60 at 43:16-24).

M.D. recounted Mr. Isoh's behavior escalating from fondling her breasts on the outside of her clothing to taking his penis out and forcing her to touch it. (NYSCEF Doc. No. 52 at 85:11-13; 88:8-11.) The next week the abuse escalated to digital penetration and the week after that he penetrated her with his penis. (NYSCEF Doc. No. 52 at 88:13-20; 120:8-12; 125:12; 145:3-9; 154:18-155:24; 160:21-161:10; 163:11-19; 168:20-24; 176:7-12; 176:15-19; 178:21-179:8.)

M.D. began to modify the way she dressed in the hope that Mr. Isoh would stop bothering her and that it would be more difficult for him to touch her. (NYSCEF Doc. No. 52 at 97:2-12; 98:4-13; 159:7-9; 159:20-24.) This strategy was not successful and she continued to try to fend him off each time he grabbed her. (NYSCEF Doc. No. 52 at 99:9-13; 101:20-102:2; 155:10-22.) Despite her efforts to resist Mr. Isoh, he was stronger than M.D. and would force her hand on to his penis, grab her by the waist, fondle her breasts, wrestle her down, and she would fight her way out. (NYSCEF Doc. No. 52 at 123:2-124:25; 154:18-155:24; 159:2-12; 160:8-13.) After each incident, she would need to fix herself — adjust her clothing — before returning to the main work area. (NYSCEF Doc. No. 52 at 133:18-20; 155:24.) That is, until the last incident, when Mr. Isoh raped her, and she left for good. (NYSCEF Doc. No. 52 at 184:24; 185:12-17; 186:9-10.)

M.D. did not tell her probation officer, anyone at CUNY Law School, nor anyone else about Mr. Isoh's conduct and her experiences. (NYSCEF Doc. No. 52 at 83:7-11; 116:9-117:9; 136:4-6; 137:4-8; 151:23-153:7; 165:2-4; 172:21-25; 175:7-10; 186:16; 189:3-5.) She believed, in part, that she could get in trouble for it and was embarrassed. (NYSCEF Doc. No. 52 at 28:4-5; 137:9-16; 150:25-151:13; 175:12.)

M.D. had never heard anything about Mr. Isoh behaving inappropriately with others. (NYSCEF Doc. No. 52 at 136:10-21.) Mr. Isoh denies that he molested and raped M.D.. (NYSCEF Doc. No. 53 at 20:23-25; 21:8-11.) Nor does he recall threatening M.D. if she told anyone of the abuse. (NYSCEF Doc. No. 53 at 21:12-17.) Indeed, Mr. Isoh does not recall M.D. at all. (NYSCEF Doc. No. 53 at 21:22-23.) Ms. Rana was not aware of the alleged sexual abuse M.D. experienced and did not know if anyone else knew of it. (NYSCEF Doc. No. 60 at 41:20-25; 42:3-7; 49:11-14.) Nor had Ms. Rana heard rumors of Mr. Isoh sexually abusing anyone in 1990. (NYSCEF Doc. No. 60 at 28:22-29:3.) However, she did learn of allegations against Mr. Isoh for sexual abuse that occurred in 1999-2000. (NYSCEF Doc. No. 60 at 45:3-8; 45:14-19; [*4]46:23-25.)

Mr. Fields was also unaware of the sexual abuse that M.D. experienced and did not know of anyone at the school who was aware her being sexually abused by Mr. Isoh (NYSCEF Doc. No. 61 at 32:19-23). He too learned of the sexual abuse charges against Mr. Isoh in the late 1990s. (NYSCEF Doc. No. 61 at 34:12-22.)

Mr. Isoh's direct supervisor, Bill Williams, had no recollection of any complaints made against Mr. Isoh prior to 1990 about him engaging in sexually abusive conduct. Mr. Williams did not receive any reports about or know about Mr. Isoh engaging in sexually abusive conduct, recalled no rumors about Mr. Isoh engaging in sexually abusive conduct, and was unaware if Mr. Isoh had been investigated by CUNY as a result of a sexual abuse allegation. (NYSCEF Doc. No. 56 at 10:18-11:3; 12:3-5; 13:2-8.)

The law school had a sexual harassment committee in 1990. (NYSCEF Doc. No. 61 at 14:18-21; 15:10-15.) Although at some point employees were required to receive sexual abuse prevention training, there was no evidence offered of when that commenced. (NYSCEF Doc. No. 61 at 27:14-29:5.) Mr. Fields was not involved with the implementation of sexual abuse prevention policies and was not familiar with any rules about what was required if he received a report of sexual harassment because he never needed to deal with it. (NYSCEF Doc. No. 61 at 16:17-23; 26:6-20.) Mr. Williams recalled that "[t]hey spoke about stuff," but did not remember specific prevention policies and did not know what steps were required of a supervisor if a report was made to them in 1989 or 1990. (NYSCEF Doc. No. 56 at 18:14-18; 19:6-13.) Mr. Isoh did not recall receiving training about sexual abuse. (NYSCEF Doc. No. 53 at 17:3-10.) He also did not remember if he was investigated by CUNY in the 1980s or 1990s for allegations of sexual misconduct. (NYSCEF Doc. No. 53 at 20:8-12.) Ms. Rana, as an intern, was not particularly aware of relevant policies, procedures or trainings, certainly not the formal training currently required. (NYSCEF Doc. No. 60 at 34:13-35:4; 35:15-23.)

M.D.' deposition testimony reflects that she has been deeply traumatized by these experiences. She described the variety of ways it manifested. She spoke of experiencing debilitating anxiety that began when these events occurred. (NYSCEF Doc. No. 52 at 25:20-22; 30:8-13.) She described heart palpitations, panic attacks, strokes, and hypertension as a result of the anxiety that developed following these experiences (NYSCEF Doc. No. 52 at 208:14-209:3; 210:10-11; 213:17-18) and explained that she is no longer able to be intimate with her husband. (NYSCEF Doc. No. 52 at 198:21-200:5.)

The Motion
Defendants argue in their motion that they are entitled to summary judgment because Mr. Isoh's alleged misconduct fell outside the scope of employment, there is no evidence that defendants were on notice of Mr. Isoh's propensity to engage in the misconduct, and therefore claimant will not be able to meet her burden at trial [FN3]
to establish the requisite notice. (NYSCEF [*5]Doc. No. 49 [affirmation by defendants' counsel] at 20-21, ¶ 125.) Claimant opposes the motion, arguing that there are genuine issues of material fact concerning who hired, vetted, and supervised Mr. Isoh and whether defendants were negligent in supervising Mr. Isoh; whether defendants' failure to have and enforce sexual abuse prevention policies created a foreseeable risk of abuse; and whether the State was on notice of Mr. Isoh's alleged propensity for sexual abuse. (NYSCEF Doc. No. 59 at 7-8.) Defendants did not reply.

The Law and Analysis
It is well established that the party seeking summary judgment must make a prima facie showing that they are entitled to judgment as a matter of law by providing sufficient admissible evidence to show the absence of any material issues of fact. (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; see Nellenback v Madison County, 2025 NY Slip Op 02263 *3 [2025].) If the moving party is able to make this showing, the burden then shifts to the party opposing the motion to produce sufficient admissible evidence that establishes the existence of material issues of fact that would require a trial. (Id.) In reviewing the motion, the Court is required to view the facts "in the light most favorable to the non-moving party." (Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 339 [2011].) Therefore, summary judgment "should only be granted where there are no material and triable issues of fact." (114 Woodbury Realty, LLC v 10 Bethpage Rd., LLC, 178 AD3d 757, 760 [2d Dept 2019] [internal quotation marks and citations omitted].) As the Court of Appeals recently explained in Nellenback, although bringing a claim for events that occurred long ago is extremely challenging, the evidentiary burdens remain the same. (2025 NY Slip Op 02263 *4 [2025].)

An employer can be found vicariously liable for their employees' negligent and intentional tortious actions under the common-law doctrine of respondeat superior [FN4]
when, and only when, an employee is acting within the scope of their employment. (Rivera v State of New York, 34 NY3d 383, 389 [2019].) New York courts have found as a matter of law that when an employee sexually abuses others in the course of employment, it is solely for their personal benefit and is "unrelated to the furtherance of [their employer's] business." (Judith M. v Sisters of Charity Hosp., 93 NY2d 932, 933 [1999]; see N.X. v Cabrini Med. Ctr., 97 NY2d 247, 251 [2002] [An employee's sexual abuse is not in furtherance of employer's business and "is a clear departure from the scope of employment, having been committed for wholly personal motives"].) Therefore where, as here, there is no question that the conduct alleged was outside of the scope of Mr. Isoh's employment, defendants will not be liable under the common law doctrine of respondeat superior.

However, an employer may be held liable for the negligent screening, hiring, retention, or supervision of an employee when that employee's actions were "outside the scope of employment" and "the employer was aware of, or reasonably should have foreseen, the [*6]employee's propensity to commit such an act." (Medical Care of W. NY v Allstate Ins. Co., 175 AD3d 878, 880 [4th Dept 2019] [internal quotation marks and citation omitted].) Put another way, defendants' liability here hinges on whether they had, or should have had, notice that Mr. Isoh previously committed or had a propensity for sexual abuse.[FN5]
(Nellenback v Madison County, 2025 NY Slip Op 02263 *3 [2025].) However, in order to find liability for failing to sufficiently screen an employee, there must be evidence offered that the employee had previously engaged in similar misconduct — that is, there must be evidence that, had they looked, they would have found something that would have put them on notice. (See KM v Fencers Club, Inc., 164 AD3d 891, 893 [2d Dept 2018].) There is otherwise no legal duty to conduct a background check. (Id.) Similarly, without any evidence that defendants should have known of a propensity for sexual assault — prior allegations of abuse, for example - there is no common law duty to supervise an employee in any particular way. (Pater v City of Buffalo, 141 AD3d 1130, 1131 [4th Dept 2016].) It is true that an employer cannot shut its eyes to an employee's misconduct. (Moore Charitable Found. v PJT Partners, Inc., 40 NY3d 150, 158 [2023].) However, there must be evidence that there was something there for them to have seen before the incident alleged occurred.

Defendants argue in their motion that they had no notice that Mr. Isoh previously engaged in sexually abusive conduct nor that he had a propensity to do so. (NYSCEF Doc. No. 49 at 24, ¶ 132.) In support of their argument, defendants cite to the absence of any prior instances, allegations, or investigations of sexual abuse or misconduct in Mr. Isoh's employment file. (NYSCEF Doc. No. 57a.[FN6]
) They also offer the deposition testimony of the claimant, M.D.; Materials Management employee Carmen Rana; former CUNY Law School Associate Dean, Dave Fields; and Mr. Isoh's former supervisor, Bill Williams. None had any prior knowledge of, heard rumor of, recalled, nor were made aware of any prior instances of Mr. Isoh engaging in sexual abuse. (NYSCEF Doc. No. 52 at 136:7-137:3; NYSCEF Doc. No. 54 at 28:22-29:3; NYSCEF Doc. No. 61 at 44:21-25; NYSCEF Doc. No. 56 at 9:23-25, 10:2-4; 10:18-22; 10:23-11:3.) Defendants have therefore made a prima facie showing that they are entitled to judgment as a matter of law by providing sufficient admissible evidence to show the absence of any material issues of fact as to whether they had the notice necessary to establish liability under negligent screening, hiring, retention, or supervision or other theories of negligence.

Having demonstrated that they did not have notice of Mr. Isoh committing similar tortious conduct, nor any evidence that they were aware of any conduct that could have alerted them to the potential for harm, the burden now shifts to the claimant to produce sufficient admissible evidence that establishes the existence of material issues of fact that would require a trial. The evidence offered must be "based on more than hypothetical or unsubstantiated [*7]assertions." (Nellenback v Madison County, 2025 NY Slip Op 02263 *3 [2025].)

Claimant argues [FN7]
that defendants knew of Mr. Isoh's propensity for sexual abuse and therefore had a duty to act but failed to do so. (NYSCEF Doc. No. 59 at 8.) Claimant offers Dean Field's deposition testimony that he was alerted by Bill Williams to allegations against Mr. Isoh in the "late 1990s" as evidence that defendants had notice of Mr. Isoh's propensity to sexually abuse. (NYSCEF Doc. No. 61 at 34:12-22; 36:24-37:6). Claimant also offers Carmen Rana's deposition testimony concerning allegations made by a young woman about Mr. Isoh for the same purpose, to establish notice. (NYSCEF Doc. No. 60 at 45:3-19.) On cross-examination at the deposition, Ms. Rana explained that these allegations were made in 1999 or 2000. (NYSCEF Doc. No. 60 at 46:18-25.) Although claimant implicitly acknowledges that the allegations made in the "late 1990s" occurred after the allegations raised in this claim, she maintains that "it is unknown when that abuse/harassment occurred in relation to Claimant's claims" and suggests "it is unclear if the actual abuse/harassment in that matter preceded or overlapped Claimant's incident which occurred in the early 90s." (NYSCEF Doc. No. 59 at 8 [emphasis in original].) Claimant also asks "whether this incident is even the same incident the State sought a protective order regarding." (Id.) Claimant concludes that the question of when the defendants learned about this second allegation raises a question of fact regarding whether or not the State had notice of Mr. Isoh's propensity for sexual abuse but ignored it thus making claimant's abuse foreseeable. (Id. at 8-9.)

The crux of claimant's argument here is that it is possible that the abuse reported in the late 1990s actually occurred nearly a decade earlier, prior to or at the time of claimant's abuse in 1990. Putting aside that claimant offers no evidence of this, the argument falls short for two other reasons. Even if this incident did occur prior to or at the time of claimant's abuse and was not reported and investigated by defendants until the late 1990s, the defendants still would not have had notice of Mr. Isoh's abuse such that it would raise a triable issue of fact here.

Moreover, as acknowledged by claimant, M.D. moved to compel the production of Mr. Isoh's entire personnel file. (NYSCEF Doc. Nos. 20-24 [M-100988].) The defendants opposed the motion, primarily arguing that the records sought by claimant post-dated the alleged sexual abuse and were therefore irrelevant and inadmissible. (NYSCEF Doc. Nos. 26-29.) The Court concluded that, to the extent the withheld employment records contained documents that were "material and relevant" to the claim, claimant was entitled to them and to the extent that the content post-dated the claim, claimant was not entitled to them. (NYSCEF Doc. No. 34, M.D. v State of New York, UID No. 2024-069-070 [Ct Cl, Marnin, J., Sept. 13, 2024].) That is, as relevant to this motion, had the redacted records included relevant information that pre-dated the 1990 incident, whether in connection with later allegations made or investigations conducted after 1990 or for any other reasons, claimant would have been entitled to those records. In order [*8]to determine whether or not the records contained material and relevant information, the Court ordered the defendants to produce the records for in camera inspection. (NYSCEF Doc. No. 32, M.D. v State of New York, UID No. 2024-069-068 [Ct Cl, Marnin, J., Sept. 10, 2024].) The defendants promptly complied and the Court conducted an in camera review. The Court reviewed the records and carefully considered whether the redacted portions of Mr. Isoh's employment records contained any information to which M.D. was entitled. (NYSCEF Doc. No. 34.) The Court concluded that the redaction of the post-1990 information was appropriate and denied claimant's motion. (NYSCEF Doc. No. 34.)

The claimant's burden here was to produce sufficient admissible evidence that defendants were on notice — whether they had actual knowledge or had reason to know — of Mr. Isoh's propensity for sexually abusive conduct. Neither the deposition testimony offered nor claimant's unfounded speculation about the content of Mr. Isoh's employment records established that defendants were on notice. Therefore, the claimant has not established that there are material issues of fact as to whether defendants had the notice necessary to establish liability under negligent screening, hiring, retention, or supervision.

Claimant also insists that, beyond the question of notice, there are "glaring issues of fact" concerning who vetted, hired and supervised Mr. Isoh and argues that "[t]his lack of clarity and failure of supervision created a foreseeable environment in which Mr. Isoh could abuse his position of power and cause harm." (NYSCEF Doc. No. 59 at 10.) Even if the Court accepts that we do not know by whom Mr. Isoh was vetted, who offered him the job, or how often his supervisor met with him and whether that was sufficient, without evidence that there was something to be learned by closer vetting or supervision, these questions are immaterial and do not raise material issues of fact for trial. Put another way, claimant needed to offer evidence that there was something in Mr. Isoh's professional past that, if a reference check was conducted, defendants would have learned about it; or, had his supervisor met with him more frequently, he would have learned that Mr. Isoh had a propensity for — or was engaged in - the sexually abusive conduct alleged. But claimant has not provided any such evidence.

The case law on which claimant relies in support of her argument that defendants may be held liable even without notice is inapposite. Claimant conflates a school's duty to supervise their students with supervision of an employee. (NYSCEF Doc. No. 59 at 11-12.) Bell v Board of Educ. of City of NY (90 NY2d 944 [1997]), Doe v Fulton School Dist. (35 AD3d 1194 [4th Dept 2006]), Coon v Board of Educ. of City of NY (160 AD2d 403 [1st Dept 1990]); and Gonzalez v Mackler (19 AD2d 229 [1st Dept 1963]) concern, respectively, the supervision of a child on a field trip, students in a locker room, students going down the stairs at a school, and students in a classroom. Whereas an employer must have notice of an employee's propensity to do harm before a duty attaches, a school's duty to supervise students "is unqualified and mandatory" and where that duty is mandatory "notice is not an issue." (Coon v Board of Educ. of the City of NY, 160 AD2d 403, 403 [1st Dept 1990].) Here, however, notice is an issue, indeed it is a necessary precondition to establish that there is a duty. Without notice, these questions about defendants' supervision, hiring, or vetting are immaterial because there is no common-law duty to use any particular procedures. (Hashimi v Gap, Inc., 232 AD3d 857, 858-859 [2d Dept 2024].) Stated more clearly, it is the notice that creates the duty.

Claimant next argues that defendants cannot avoid liability here because they cannot show "that they exercised reasonable care to prevent and promptly correct any sexually harassing behaviour." (NYSCEF Doc. No. 59 at 20.) Claimant maintains that the defendants [*9]"lack of clarity" about and failure to implement effective sexual harassment prevention policies "created an environment in which abuse was foreseeable." (Id.) The decision to which claimant cites in support of her argument, Hill v Children's Vil. (196 F. Supp 2d 389 [SDNY 2002]), concerns a sexual harassment case that was brought under Title VII of the Civil Rights Act of 1964, as amended, 42 USC 2000e et seq. and New York Human Rights Law, Executive Law § 290 et seq. However, the claim here is a negligence claim (hiring, retention, supervision, and infliction of emotional distress) (NYSCEF Doc. No. 1 at 3, ¶ 11) and was not — and could not have been timely - brought under federal or state anti-discrimination laws. Questions about whether defendants had a sexual harassment policy, whether employees had clarity about such a policy, and whether defendants implemented that policy in an effective manner are typically issues of material fact in a Title VII claim. There, an employer will be vicariously liable for a supervisor's harassment unless it is able to avoid liability by showing that it exercised reasonable care to prevent and promptly corrected sexually harassing conduct or arguing that the employee unreasonably failed to follow the policy. However here, where there has been no evidence offered that defendants were on notice of Mr. Isoh's propensity for sexual abuse and no evidence offered that defendants should have been aware of widespread sexual abuse existing in this type of setting, the existence and implementation of policies, on their own, sheds no light on notice.

Moreover, this claim accrued in 1990. Courts had only recently begun to recognize that sexual harassment was unlawful, Anita Hill had not yet testified before the United States Senate Judiciary Committee, and laws in New York State requiring all employers to adopt and distribute sexual harassment prevention policies and provide annual training for employees would not exist for decades. It is simply not appropriate for the Court to hold 1990 employers to 2025 standards, expectations, and laws. (See Nellenback v Madison County, 2025 NY Slip Op 02263 *4, n7 [2025].)

Finally, although emotional harm stemming directly from negligence may be compensable where no physical injury occurred (Brown v New York Design Ctr., Inc., 215 AD3d 1, 9 [1st Dept 2023]), as discussed at length above, because there was no notice of Mr. Isoh's propensity for sexual abuse, there was no duty created. Again, with no duty, there can be no negligence. (See KM v Fencers Club, Inc., 164 AD3d 891, 893 [2d Dept 2018].)

Claimant has offered evidence that the sexual abuse alleged in her claim occurred and that she was deeply harmed by the abuse. However, because M.D. was not able to offer evidence that the defendants were on notice — or should have been on notice - of Mr. Isoh's propensity for sexually abusive conduct, she has been unable to establish that there are any material issues of fact that require trial.

Accordingly, it is

ORDERED, that defendants' motion for summary judgment (M-102096) is GRANTED and claim no. 138957 is DISMISSED, with prejudice.

September 16, 2025
New York, New York
SETH M. MARNIN

Judge of the Court of Claims

In rendering this Decision and Order the Court read and considered the following documents:

1. NYSCEF Doc. No. 48, defendants' notice of motion for summary judgment filed on April 14, 2025;

2. NYSCEF Doc. No. 49, affirmation in support by Akosua K. Goode, Assistant Attorney General filed on April 14, 2025;

3. NYSCEF Docs. Nos. 50-57, constituting exhibits A (claim), B (answer), C (claimant's EBT transcript), D (Benedict Isoh's EBT transcript), E (Carmen Rana's EBT transcript), F (David Fields' EBT transcript), G (William H. Williams' EBT transcript), and H (confidential employment records), all filed on April 14, 2025;

4. NYSCEF Doc. No. 59, claimant's memorandum of law filed on June 24, 2025;

5. NYSCEF Docs. Nos. 60 and 61, constituting exhibits 1 (Carmen Rana's EBT transcript) and 2 (William H. Williams' EBT transcript);

6. NYSCEF Doc. No. 1, verified claim;

7. NYSCEF Doc. No. 7, verified answer;

8. NYSCEF Doc. No. 32, M.D. v State of New York, UID No. 2024-069-068; and

9. NYSCEF Doc. No. 34, M.D. v State of New York, UID No. 2024-069-070.

Footnotes

Footnote 1:The caption was previously amended sua sponte to reflect New York State and The City University of New York as the only proper defendants named.

Footnote 2:Although there was deposition testimony that suggested Mr. Isoh was not an employe of CUNY, the issue was not raised or developed by the parties and, in the interest of judicial economy, need not be addressed here. (See, e.g., NYSCEF Doc. No. 61 at 17:19-19:20 ["Ben Isoh was a nonstate employee . . . [h]e was not a university employee . . . [h]e was not paid by the State. He was not on our payroll."]; NYSCEF Doc. No. 56 at 23:4-18 [CUNY Research Foundation paid his salary and the law school hired him].)

Footnote 3:Throughout their motion, defendants misstate claimant's burden at trial, arguing that she will need to prove the elements of her claim "by clear and convincing evidence." (NYSCEF Doc. No. 49 at 20, ¶ 125; 23, ¶ 131; 24, ¶ 132.) While claims brought seeking relief under the Unjust Conviction and Imprisonment Act, Court of Claims Act § 8-b, must be proven by clear and convincing evidence, a negligence claim like M.D.' needs only to be proven at trial by a preponderance of the credible evidence.

Footnote 4:The claim does not allege that Mr. Isoh was acting within the scope of his employment. However, claimant's memorandum of law in opposition to the defendants' motion argues that "under the doctrine of Respondeat superior, employers may still be held liable under theories of negligent hiring, retention, and supervision of the employee if the employer is found to have 'placed the employee in a position to cause foreseeable harm' which could have been avoided had the employer taken reasonable care in making decisions respective to the hiring and retention of employees." The Court will therefore briefly address this theory of liability.

Footnote 5:While the Court appreciates that current and former employees of CUNY Law School expressed their belief that the school had a responsibility to protect people on the premises from being sexually abused by staff, their beliefs do not create a legal duty. (See NYSCEF Doc. No. 53 at 18:16-24; NYSCEF Doc. No. 56 at 18:19-24; NYSCEF Doc. No. 61 at 30:4-18; NYSCEF Doc. No. 60 at 35:25-36:20.)

Footnote 6:NYSCEF Doc. No. 57a refers to the unredacted version of Mr. Isoh's employment file provided to the Court.

Footnote 7:No answering affidavit or affirmation accompanied claimant's Memorandum of Law. Unsworn statements contained in a memorandum of law and not supported elsewhere by admissible evidence are "without probative value." (Freedom Mtge. Corp. v Engel, 198 AD3d 877, 879 [2d Dept 2021]; see Byrd v Roneker, 90 AD3d 1648, 1649 [4th Dept 2011].) Although irregular and not in compliance with CPLR 2214 (b), the absence of claimant's affirmation or affidavit does not prevent the Court from considering claimant's legal arguments where they are supported by admissible evidence.